724 A.2d 1

Kevin WIGGINS

v.

STATE of Maryland.

No. 121, Sept. Term, 1997.

Court of Appeals of Maryland.

Feb. 10, 1999.

Stuart M. Rennert (Donald B. Verrilli, Jr., Gregory P. Magarian, Elena N. Broder, Heidi D. Kitrosser, Jenner & Block, on brief), Washington, DC, for Appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

In 1989, appellant was convicted by Judge J. William Hinkel, sitting in the Circuit Court for Baltimore County, of the

robbery and first degree murder of Florence Lacs and two counts of theft. A jury summoned to determine the appropriate punishment for the murder found that appellant should be put to death, and, upon that verdict, Judge Hinkel imposed a sentence of death. We affirmed that judgment in *Wiggins v. State*, 324 Md. 551, 597 A.2d 1359 (1991), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992), rejecting appellant's claims that the evidence was legally insufficient to establish that he was the murderer and that the trial court erred in denying his motion for new trial.

In January, 1993, appellant filed a petition for relief under the Post Conviction Procedure Act (Maryland Code, Article 27, § 645A), ultimately raising 38 claims embodying 52 issues, among which were that he was denied the effective assistance of counsel at both his trial and his sentencing proceeding. After an extensive evidentiary hearing, the hearing judge, John F. Fader, II, announced from the bench his tentative conclusion that counsel had been deficient in at least two respects—failing at trial and at sentencing to elicit evidence from the assistant medical examiner regarding her initial determination as to the approximate time of Ms. Lac's death, and failing at the sentencing proceeding to present certain mitigating evidence—but he reserved judgment as to whether those deficiencies were sufficiently prejudicial to warrant post-conviction relief. Judge Fader indicated that a written opinion would be filed within 60 days. In October, 1997—three-and-a-half years later—he filed a 257-page opinion finding no Constitutional deficiencies at either the trial or the sentencing proceeding and therefore denying relief.

We granted appellant's application for leave to appeal that determination. Five issues are presented in the appeal, which we have reordered as follows:

(1) Whether trial counsel provided Constitutionally ineffective assistance at trial and sentencing by failing to "bring to light" evidence of a prior inconsistent opinion on the part of the State's medical expert regarding time of death;

(2) Whether trial counsel provided Constitutionally ineffective assistance (A) at trial by failing timely to obtain a forensic expert, thereby requiring appellant to choose between a jury trial without an expert and a court trial with one; and (B) at sentencing by failing to investigate, offer evidence of, or object to jury selection procedures in Baltimore County;

(3) Whether trial counsel provided Constitutionally ineffective assistance at the sentencing proceeding by failing to investigate and offer mitigation evidence concerning appellant's traumatic background and mental problems;

(4) Whether appellant was denied Constitutional rights when the State failed to disclose an agreement to treat his girlfriend, Geraldine Armstrong, leniently; and

(5) Whether the evidence was legally sufficient to support (A) his conviction of murder in the first degree; or (B) the jury's finding that he was a principal in the first degree in the murder of Ms. Lacs.

For the reasons stated in this Opinion, we shall affirm the denial of post-conviction relief.

## BACKGROUND

The 77–year old victim, Florence Lacs, resided in the Clark Manor Apartments, in Woodlawn. When she failed to attend a scheduled social event on Saturday, September 17, 1988, a friend reported her missing. At the request of the police, the apartment manager entered Ms. Lacs's apartment to investigate and found her dead in the bathtub. She was lying on her side, half covered by cloudy water. It appeared that a household cleaner and a bug spray had been poured or sprayed on her. She was wearing a white blouse and a blue skirt, but had on no underwear. The skirt had been raised to her waist. The apartment had been ransacked. Paramedics, who arrived shortly thereafter, formally pronounced Ms. Lacs dead at about 3:50 in the afternoon. The deputy medical examiner, Dr. Stanley Felsenberg, arrived around 9:00 p.m., and, while there, had the body removed from the tub, examined it, and caused it to be sent to the medical examiner's office, where,

near midnight, it was tagged and refrigerated. Dr. Margarita Korell, an assistant medical examiner, performed an autopsy at 9:00 the next morning, September 18, 1988. There is evidence that the death certificate completed by Dr. Korell estimated the time of death as Friday evening, September 16, 1988.[1] Dr. Korell listed the cause of death as drowning and the manner of death as homicide.

Appellant was a painter who had been working with a construction crew in the victim's apartment building on Wednesday, September 14, and Thursday, September 15. At some point on Thursday, Ms. Lacs asked him to move a truck that was blocking her car. Ms. Lacs attended a social event with some of her friends that afternoon but had returned to her apartment by 5:00 p.m. She was seen conversing with appellant in the hallway just outside her apartment between 5:00 and 5:50. Chianti Thomas, a twelve-year-old child visiting a friend at the next-door apartment, testified that Ms. Lacs's assistance was sought in locking the door to the friend's apartment, that appellant appeared from the basement and volunteered his assistance, and that she heard Ms. Lacs and appellant briefly converse about "watching" some sheetrock. That was the last time Ms. Lacs was seen alive.

On Thursday evening, around 7:45 p.m., appellant arrived at the home of his girlfriend, Geraldine Armstrong, driving the victim's car. He and Ms. Armstrong went shopping, using the

---

1. The death certificate was identified by Dr. Korell and admitted as Defendant's Exhibit 4 at the sentencing proceeding. There is no indication in the record that it was offered or admitted at the trial before Judge Hinkel. We are unable to locate the certificate in the record now before us. In his dissent in the direct appeal, Judge Eldridge stated that "[t]he Death Certificate, as originally filled out by the State's expert, fixed the approximate time of death as Friday evening," (*Wiggins*, 324 Md. at 585, 597 A.2d at 1375) and that is consistent with testimony in the record. The record in this appeal, which consists of documents presented at the trial, the sentencing hearing, and the post-conviction hearing, is quite large and not well-indexed. A number of documents and papers appear to be missing. As there seems to be no dispute that the original certificate listed the approximate time of death as noted, the fact that the document cannot be located is not important.

victim's credit cards, which appellant told Ms. Armstrong belonged to his aunt. They repeated that activity the next day (Friday, September 16) as well. On Saturday, they pawned a ring that belonged to Ms. Lacs. Appellant and Armstrong were arrested on September 21, while driving Ms. Lacs's car. Upon his arrest, appellant claimed that he had found the car, with the keys, credit cards, and ring in it, on Friday, on a restaurant parking lot. That, of course, was inconsistent with the otherwise undisputed fact that he was in possession of the car and the credit cards on Thursday evening.

Principally on this evidence, the State charged appellant with first degree murder, robbery, and theft, and sought the death penalty. Appellant, represented by Carl Schlaich and Michelle Nethercott, waived a jury trial and elected to be tried before Judge Hinkel. After a four-day trial, Judge Hinkel found appellant guilty of robbery, first degree felony murder, and theft. Appellant then elected to have his sentence on the murder conviction determined by a jury, which was summoned for that purpose. After a six-day hearing, the jury found that appellant was a principal in the first degree, that the murder was committed in the course of robbing the victim (an aggravating factor), that appellant had not previously been convicted of a crime of violence (a mitigating factor), that the aggravating factor outweighed any mitigating factors, and that the sentence should be death.[2] While automatic review of that judgment was pending in this Court, appellant moved for a new trial, which Judge Hinkel denied. As noted, we affirmed the judgments, and the United States Supreme Court denied appellant's petition for *certiorari*.

## DISCUSSION

### *Time of Death*

The evidence of appellant's guilt, at least of murder, was almost entirely circumstantial, there being neither eyewitness

---

2. One or more, but fewer than 12, jurors also listed as a mitigating factor "His background."

testimony nor physical evidence directly connecting appellant to the murder itself or to the interior of Ms. Lacs's apartment. The State's theory was that appellant had entered Ms. Lacs's apartment between 5:00 and 5:30 on Thursday afternoon, robbed her, and, in the commission of the robbery, forced her into the bathtub and drowned her. Her death may have been facilitated by her significant cardiovascular disease, which was listed on the death certificate as a contributing factor.

The State's case rested essentially on seven facts or circumstances: (1) the fact that Ms. Lacs was seen by friends as late as 4:15 p.m. on Thursday, September 15, in her car, wearing a blue skirt and a white blouse; (2) when found dead on Saturday in the bathtub, she was wearing a blue skirt and a white blouse;[3] (3) the fact that her weekly TV Guide had programs marked through September 15, with no markings for the 16th or beyond; (4) although appellant finished work at 4:45 p.m. on Thursday and had no particular reason to remain on the premises, he was seen with Ms. Lacs in the hallway outside her apartment between 5:00 and 5:30 p.m., which was the last time anyone saw her alive; (5) his explanation to his supervisor, who saw him at the apartment building some 25 minutes after appellant finished work, that he needed to move some sheetrock and the supervisor's response that (i) he had not asked appellant to move any sheetrock, (ii) moving sheetrock was not part of appellant's job, and (iii) in any event, moving the sheetrock should not have taken more than a few minutes; (6) appellant's possession and unlawful use of Ms. Lacs's automobile, credit cards, and jewelry later that eve-

---

3. The evidence regarding Ms. Lacs's skirt was not without contradiction. One of her friends, Elizabeth Lane, testified that Ms. Lacs was wearing a red skirt on Thursday, and different recollections of the exact color of the skirt she was found in were recorded. There was testimony that it was light blue and that it was teal or blue-green. There was evidence that it was a darker blue. *See Wiggins v. State, supra,* 324 Md. at 586, 597 A.2d at 1376 (J. Eldridge, dissenting). Judge Hinkel found, as a fact, that Ms. Lane was mistaken and that Ms. Lacs was wearing the same outfit, when found in the bathtub, that she was wearing on Thursday afternoon. Inferentially, in finding appellant to have been a principal in the first degree in Ms. Lacs's murder, the jury made the same determination.

ning; and (7) incriminating statements that appellant allegedly made to two fellow inmates during his pre-trial detention. Judge Hinkel, in announcing his verdict, gave no weight to the testimony of the two fellow inmates.

Apart from the overall circumstantial nature of the case as to criminal agency, four particular circumstances caused the defense to focus on medical evidence regarding the approximate time of death: (1) Ms. Lacs was clearly still alive at 5:00 to 5:30 on Thursday, September 15; (2) by 7:45 that evening, appellant was in possession of her car and items allegedly taken from her or her apartment; (3) although appellant reported briefly for work on Friday morning, September 16, there was no direct evidence that he was in or near Ms. Lacs's apartment after 5:30 on Thursday afternoon; and (4) one of Ms. Lacs's friends, Edith Vassar, testified that Ms. Lacs telephoned her at 10:00 or 10:30 on Friday morning, September 16. In the view of the defense, unless the State could show that Ms. Lacs was or could have been killed during the approximately two-hour window between 5:30 and 7:30 p.m. on September 15, its evidence that appellant was the killer, as opposed to merely a thief, would have been much less persuasive.

The issue of time of death first came before the court in the context of a pre-trial motion to dismiss or narrow the indictment. The indictment charged that the killing occurred between September 15 and September 17, and, based on the holding of the Court of Special Appeals in *State v. Mulkey*, 73 Md.App. 501, 534 A.2d 1374 (1988), appellant claimed that the indictment was not sufficiently particular—that the State should be required to allege with greater precision when the murder occurred.[4] In arguing the motion, Mr. Schlaich in-

---

4. In *Mulkey*, the indictment charged the defendant with committing child abuse and sexual offenses between June 1 and September 6, 1982, June 1 and September 5, 1983, and June 1 and September 3, 1984. The Court of Special Appeals affirmed an order dismissing the indictment as not complying with particularity requirements. Shortly before the hearing on appellant's motion, we reversed the judgment of the Court of Special Appeals, holding that the trial court should have ruled

formed Judge Hinkel that Ms. Nethercott, his co-counsel, had interviewed Dr. Korell on July 18, 1989, and that Dr. Korell had said that (1) she *could* prescribe a range of time of death, but (2) the State had never asked her to do so. Probed by the court, Mr. Schlaich said that Dr. Korell had advised Ms. Nethercott that "the outside limit at that point would have been 24 hours" and more likely would be about 12 hours. Her opinion thus was that death probably occurred between 12 and 24 hours prior to discovery of the body at 3:50 p.m. on September 17. That would have been consistent with what she put on the death certificate. Mr. Schlaich said further that, as the result of a call from the Assistant State's Attorney, Dr. Korell called his office two days later and advised that she had changed her opinion as to time of death. She apparently told Ms. Nethercott that, after consulting with a "female supervisor" whom she would not name, she came to believe that death could have occurred up to 48 hours prior to discovery of the body. Mr. Schlaich noted:

"Obviously, that's something we can attack later on at trial, but I'm pointing this out to the court because it is indicative of how key of an issue the time of death is about to become and will be in this case.

The Medical Examiner now calls us herself and says, 'I've got to point out to you that I must have been wrong.' So obviously, it is getting around that this is going to be important. The reason it is going to be important is the State in its own indictment and certainly in all of the evidence provided in discovery indicates that Mr. Wiggins was in possession of the victim's property on September the

on a pending demand for particulars before dismissing the indictment. We remanded the case for further proceedings, not ruling out the prospect of an ultimate dismissal. *See State v. Mulkey,* 316 Md. 475, 560 A.2d 24 (1989). Appellant was made aware of our holding in *Mulkey* just prior to the hearing. His point was that the law still required some particularity and that he should not be put in a position of effectively having to establish an alibi for a three-day period. Whether appellant was entitled to a dismissal or narrowing of the indictment under *Mulkey* is not an issue in this appeal.

15th. She is found dead on September the 17th. That's a three day span."

Mr. Schlaich continued by noting the importance of the alleged robbery, which would serve as an aggravator for purposes of the death penalty: "Obviously, if Mr. Wiggins has the property before she is dead, there's a problem with that aggravator. If Mr. Wiggins acquires the property after she is dead, then maybe that's not true." [5] If, as Dr. Korell initially believed, death occurred within 24 hours before discovery of the body, appellant would have been in possession of the stolen property before Ms. Lacs was murdered. Mr. Schlaich also noted the statement of Ms. Vassar that Ms. Lacs had called her on Friday morning, September 16. "So," he concluded, "there's a serious and obvious issue here as to time of death."

The prosecutor, in response, told the court that her information from the medical examiner's office was that they could not establish a more particular time of death, and that is why the indictment was worded as it was—that Ms. Lacs was last seen alive on September 15 and was discovered dead on September 17. Essentially on that basis, the court denied the defense motion to dismiss or particularize the indictment.

The issue next surfaced at trial. In an opening statement, Ms. Nethercott recounted that the medical examiner (Dr. Korell) had told counsel that Ms. Lacs had not been dead for 48 hours but later reevaluated that view. Dr. Korell was called to testify as a State's witness. By way of background, Dr. Korell, who apparently was raised in Argentina, had been an assistant medical examiner for about 10 years when she performed the autopsy on Ms. Lacs. Although she was not board-certified, she had performed over 3,000 autopsies and

---

5. Not only would the fact that a homicide occurred during the course of a robbery elevate the homicide to first degree felony murder (Md.Code, Article 27, § 410), thereby making the perpetrator subject to the death penalty (Article 27, § 412(b)), but the fact that the murder was committed during the commission or attempted commission of a robbery constitutes an aggravating factor for purposes of imposing the death penalty (Article 27, § 413(d)(10)).

was qualified as an expert in forensic pathology in every county of Maryland, in Federal court, and in Washington, D.C., New York, Illinois, and Florida. Dr. Korell recounted her findings from the autopsy—that Ms. Lacs died of drowning and that the manner of death was homicide. When asked by the prosecutor whether she could determine how long Ms. Lacs had been dead, Dr. Korell said that it would be a guess, somewhere between 12 and 48 hours.[6] She noted that the body had been in the refrigerator all night and said that it would help if she knew the condition of the body when Dr. Felsenberg examined it on the evening of September 17.[7] With the information available, she was not able to express an opinion within a reasonable degree of medical certainty "as to time of death."

Mr. Schlaich, on that ground, moved to strike Dr. Korell's testimony, but the court denied the motion, leaving her testimony as indicating that "she's unable to say with any degree of medical certainty or probability what the maximum period of time was." Mr. Schlaich then cross-examined Dr. Korell

---

6. It is not entirely clear whether Dr. Korell was estimating from the time of the autopsy on Sunday morning or from the time the body was removed from the water on Saturday evening. At one point, she spoke in terms of when she performed the autopsy, but at another she spoke of whether the body was in the water for 12, 36, or 48 hours. Based on her testimony at the sentencing hearing, *see ante,* it appears that she was referring to when the body was removed from the water. That would have put the earliest time of death at about 9:00 Thursday evening.

7. Dr. Felsenberg made a written report of his findings, and Dr. Korell acknowledged having read that report. It does not appear that a copy was ever admitted into evidence, however. There is in evidence, as State's Exhibit 47, a file memorandum from Mr. Schlaich dated July 24, 1989, reporting a conversation that he had with Dr. Felsenberg regarding the report. According to the memorandum, Dr. Felsenberg said that "he cannot place an outside limit on the time of death, however, he recalls that the police were clear that Ms. Lacs had been alive at 1030 on September 17 (Saturday), which would be consistent with what he saw. He also remembers that the last contact from the victim was by phone with a friend." There is no evidence in the record, and no recorded report from the police, that Ms. Lacs was alive on Saturday. Dr. Felsenberg may have been referring to Ms. Vassar's statement that she spoke with Ms. Lacs on Friday morning.

with regard to a number of her findings but did not inquire further about a time of death. He did not ask about the conversation she had with Ms. Nethercott, about her initial view that death occurred within 24 hours prior to discovery of the body, about the statement on the death certificate attesting that death occurred on Friday, September 16, about the conversation she supposedly had with her supervisor, or about the reported change in her opinion.

Appellant produced his own expert, Dr. Gregory Kauffman, to testify as to time of death. Dr. Kauffman was a forensic pathologist and a lawyer. He had served as an assistant medical examiner in Maryland, in California, and in Michigan, and had conducted some 4,000 autopsies, although, like Dr. Korell, he was not board-certified. He examined Dr. Korell's autopsy report, photographs of the body taken at the scene, the photographs taken of the body just prior to the autopsy, the paramedic's report, and Mr. Schlaich's memorandum of his conversation with Dr. Felsenberg, and he said that he was aware of how and when the body was discovered and its condition when discovered. Based in large part upon the pictures of the body taken at the scene and at the time of autopsy, he opined, within a reasonable degree of medical certainty, that Ms. Lacs had not been dead for more than 18 hours prior to the time the body was removed from the bathtub and photographed at the apartment (or 21 hours before it was delivered to the medical examiner's office and refrigerated). That would have made the earliest time of death 3:00 a.m. on Saturday. Of importance to him was the lack of any noticeable decompositional changes, particularly in those parts of the body that had not been submerged in the bathtub. He stated that, due to the refrigeration, there would have been no significant decomposition between the time the body was refrigerated and the time the photograph was taken the next morning. Although aware of Dr. Felsenberg's statement that Ms. Lacs was last known to be alive on Saturday, Dr. Kauffman said that he gave no significance to that in determining his estimate of when she died.

In light of Dr. Kauffman's testimony, the State called in rebuttal Deputy Chief Medical Examiner Ann Dixon, but, because she had not been listed as a witness in discovery and had never rendered a report, the court sustained appellant's objection to her testifying.

In announcing his findings, Judge Hinkel began by stating the evidence that he found not to be credible. That included the testimony of appellant's fellow inmates as to the supposed incriminating statements made by appellant, appellant's written statement given to the police upon his arrest that he had found Ms. Lacs's car, with the credit cards and jewelry in it, on a parking lot on Friday, September 16, Ms. Lane's testimony that Ms. Lacs was wearing a red skirt, rather than a blue one, on Thursday, and Ms. Vassar's testimony that Ms. Lacs called her on Friday, September 16. Ms. Lane and Ms. Vassar, he concluded, were simply mistaken. He did find, however, that appellant was at the scene on Thursday, that he knew Ms. Lacs from their earlier conversation that day, that he acquired her car and property on Thursday, and that, after work on that Thursday, he entered Ms. Lacs's apartment where he robbed and killed her. As to the time of death, Judge Hinkel stated:

"I don't know the exact time of death. I am persuaded, however, from all of the evidence that the death of Ms. Lacs did not occur sometime between 9 p.m. on September 17th and 3:00 a.m. on 9—17, which would be the 18 hour period that was testified to by Dr. Kauffman. I am persuaded that it occurred on Thursday the 15th of September."

As noted, appellant elected to have his sentence determined by a jury, which was his right under Md.Code, Article 27, § 413(b). In order to impose the death penalty, the jury was required to find, unanimously and beyond a reasonable doubt, that appellant was a principal in the first degree to the murder of Ms. Lacs (Md.Code, Article 27, § 413(e)(1); *Baker v. State*, 332 Md. 542, 570, 632 A.2d 783, 796 (1993), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994)), and, as the jury had heard none of the evidence presented at the trial before Judge Hinkel, much of the evidence presented

earlier was presented again. With respect to time of death, the State called both Dr. Korell and Dr. Dixon.

Dr. Korell informed the jury that Ms. Lacs died of drowning, with contributory arteriosclerotic cardiovascular disease, and that the manner of death was homicide. She said that she could not pinpoint a time of death—that "time of death never can be pinpointed unless somebody dies right in front of somebody else"—but estimated, within a reasonable degree of medical certainty, that Ms. Lacs "could have died 24 to 48 hours before she was found." In part, that conclusion was based on Dr. Korell's opinion that the water in the bathtub was cold water, which would better have preserved the body. She believed that the water was cold because "[Ms. Lacs] did not look like she was scalded in any way." Her estimate was also based, in part, on the fact that rigor mortis and livor mortis were present when Dr. Felsenberg examined the body.

On cross-examination, Dr. Korell made clear that the 24 to 48 hour period she spoke of dated back from when Dr. Felsenberg arrived at 9:00 on Saturday evening (September 17), which would place the earliest estimated time of death at 9:00 on Thursday evening (September 15). She acknowledged that that estimate would be consistent with evidence that Ms. Lacs had a telephone conversation at about 10:30 on Friday morning. She clarified that, by "cold water," she meant water at about room temperature—cooler than lukewarm. Like at trial before Judge Hinkel, Dr. Korell was not asked about her initial view that death occurred within 24 hours prior to the body being found or about the conversations she allegedly had with Ms. Nethercott concerning that opinion and her change of mind.

Dr. Dixon confirmed that it was "all but impossible" to pinpoint a time of death "within the ground of reasonable medical certainty," but said that it was possible, by assessing the degree of post-mortem changes to the body along with a number of other factors, to determine a range. She identified, in particular, whether rigor mortis and post-mortem lividity have become fully developed and whether there was skin

slippage—separation of the outer epidermal layers of the skin caused by the onset of decomposition. Based on her review of the autopsy report, she opined that death occurred at least 24 hours before the body was examined by Dr. Felsenberg "and it could easily have been 36 to 48 hours or even more, based on the body changes." Dr. Dixon agreed that the lack of "scalding," which she said could occur even at comfortable bath temperature, indicated to her that the bath water was "cool at most." [8] Dr. Dixon stated that she observed no skin slippage on the photographs taken of the body. On cross-examination, Dr. Dixon admitted that she had a conversation with Dr. Korell about Korell's statement on the death certificate that death had occurred on Friday, September 16, and that she indicated to Dr. Korell that "she could extend her range back to 48 hours," because the body was found in cold water and "because of the post mortem changes which had occurred since ... death."

In place of Dr. Kauffman, the defense produced as its expert at sentencing Dr. Comparini, deputy medical examiner for the District of Columbia. Dr. Comparini described for the jury in some detail what happens to a body after death—the onset and eventual relaxation of rigor mortis, the development and fixing of livor mortis, and other decompositional changes. Based on her review of the autopsy report, the various photographs that were taken at the crime scene and at the autopsy, and Dr. Felsenberg's observations, she opined that death would have occurred "not more than 24 to 36 hours" prior to the autopsy on Sunday morning, September 18, which would have made the earliest time around 9:00 p.m. on Friday, September 17. On cross-examination, the State brought out that Dr. Comparini was not board-certified, that she had never before testified in a death penalty case, and that she had not consulted with either the police or the Maryland medical examiners before reaching her conclusions. She found it

---

8. Given the fact that Ms. Lacs was almost fully clothed, it is certainly a fair inference that she had not gotten into the bathtub to take a bath and would not, therefore, have filled the tub with warm water.

essentially irrelevant that the body was found partially submerged in water. Dr. Comparini did indicate, however, that the changes "after 36 and 48 [hours] ... [are] quite similar," and that the decompositional changes are gradual.

In argument to the jury, the State noted one point of agreement between the medical experts—that a precise time of death could not be determined. The prosecutor argued, in rebuttal, that "[W]e can't tell from the medical testimony alone when Ms. Lacs was murdered...." She stressed the fact that, from the brief conversation they had on Thursday, when Ms. Lacs asked appellant to move the truck, appellant knew Ms. Lacs and that he knew which car was hers. She noted further that appellant was in Ms. Lacs's presence outside her apartment when she was last seen alive between 5:00 and 5:30, that he was in possession of her credit cards, jewelry, and car about two hours later, and that he lied about whose credit cards they were and how he came into possession of her car. The State asked the jury to find that he was the killer—a principal in the first degree—from those circumstances. Defense counsel paid more attention to the medical testimony, noting Dr. Korell's estimate that death could have occurred as early as 48 hours before Dr. Felsenberg's examination (or 9:00 p.m. Thursday) but reminding the jury that on the death certificate she had listed the time of death as being on Friday. Counsel also pointed out Dr. Comparini's testimony placing the earliest time of death at 9:00 Friday evening.

In deciding upon the death sentence, the jury expressly found that appellant was a principal in the first degree in Ms. Lacs's murder.

Appellant filed a motion for new trial that Mr. Schlaich represented was based on "finding out new evidence at the sentencing phase that would have not been available to us at the guilt/innocence trial." [9] The entire thrust of the motion, taken from the argument presented in support of it, was Dr. Korell's shifting opinions as to the earliest possible time of Ms.

---

9. We are unable to locate the motion in the record before us.

Lacs's death. In a nutshell, defense counsel complained that (1) at the time of the autopsy, as evidenced by her death certificate, and as late as July 18, 1989, Dr. Korell believed that death occurred at the earliest on Friday afternoon or evening, September 16; (2) on July 20, after discussing the matter with her supervisor, she concluded that death could have occurred as early as 48 hours prior to September 17; (3) at trial, she opined that it was all guesswork and that she could not state a range within a reasonable degree of medical certainty; but (4) at sentencing, she was back to her July 20 view that death could have occurred as early as Thursday evening at 9:00. Coupled with that was the fact that the State had not disclosed Dr. Dixon in discovery and the contention that, had the defense known that Dr. Dixon would opine a range going back to 9:00 Thursday evening, the defense would not have objected to her testimony.

Arguing the motion, Ms. Nethercott explained that, on July 18, 1989—about two weeks before trial commenced—she met personally with Dr. Korell, that Dr. Korell, after reviewing her file, expressed the opinion that Ms. Lacs "had died somewhere in the range of 4 to 10 hours prior to the discovery of the body at 4:00—Dr. Felsenberg examined the body at 9:00—and that her outside limit, her furthest absolute limit was 24 hours." Ms. Nethercott stated further that she had asked Dr. Korell three times whether, in light of that conclusion, the victim was not dead as of 4:00 on September 16, "and she said yes." Ms. Nethercott continued that, on July 20, Dr. Korell called and said that, following a conversation with her supervisor, she had changed her opinion "and was now willing to extend her range on time of death back to 48 hours from the 17th of September." On July 23, the Chief Medical Examiner, Dr. Smialek returned a call from Mr. Schlaich. Dr. Korell, who was on an extension, again confirmed "that she had changed the opinion and that she had discussed this matter, after having thought about it, and that she now had a different opinion."

Ms. Nethercott recalled that, at trial, Dr. Korell testified that she could not state a time of death within a reasonable

degree of medical certainty, whereas, at the sentencing proceeding, she testified, to a reasonable degree of medical certainty, that Ms. Lacs had been dead 24 to 48 hours prior to Dr. Felsenberg's examination. That would have put the earliest time of death at 9:00 on Thursday which, Ms. Nethercott argued, was not consistent with the State's theory. Her trial testimony, according to Ms. Nethercott, created a factual issue—whether it was possible to estimate a time of death—that placed into dispute Dr. Kauffman's testimony. Had Dr. Korell testified at trial as she did at sentencing and had the defense known that Dr. Dixon would also so testify, they would not have objected to Dr. Dixon, for all three experts would then have given an earliest time of death at or later than 9:00 p.m. Thursday, which, in counsel's view, would have excluded appellant as the killer.

Judge Hinkel found no merit in that argument and denied the motion. First, he concluded that the revelation as to Dr. Korell's shifting opinions was not newly discovered evidence: counsel knew she had changed her view more than two weeks before trial. More important, he said that it would have made no difference to him, as the finder of fact, had Dr. Korell and Dr. Dixon testified at trial as they did at sentencing. That would have placed the range of time of death back to 9:00 Thursday evening—only a few hours after appellant had the opportunity to commit the crime and within two hours after he was in possession of the victim's property. He stated that "there's so many other facts in this case and there's nothing certain about medical testimony of this sort." He concluded:

"The State and the defense knew that, that the medical profession is not equipped or prepared to state with any degree of certainty, not even probability, it appears, as to matters of this nature. But all the other evidence in this case certainly was sufficient for me, at the guilt/innocence stage, and for the jury in the sentencing phase, to determine that Mr. Wiggins was a principal in the first degree."

These matters, as presented to the circuit court, were raised in appellant's direct appeal. As noted, he argued first that, because, in his view, his convictions rested solely on circum-

stantial evidence that permitted a reasonable hypothesis of innocence, they could not be sustained. Noting in particular Dr. Kauffman's testimony that Ms. Lacs likely died on September 17, appellant urged that it was possible that he broke into her apartment on the 15th and stole her credit cards and ring but did not kill her. We rejected that argument, concluding, in particular, "[t]hat the expert witnesses were either unable to agree, or differed as to the time of death, does not render clearly erroneous Judge Hinkel's ultimate finding that Wiggins robbed and murdered the victim on September 15." *Wiggins v. State, supra,* 324 Md. at 567, 597 A.2d at 1367. We also rejected his complaint about the denial of his motion for new trial, concluding (1) that, in light of Judge Hinkel's statements, both in announcing his verdict and in denying the motion for new trial, regarding the medical evidence, Dr. Korell's second revised opinion, if introduced at trial, would not have produced a different result, and (2) that her changed testimony between trial and sentencing did not render the trial fundamentally unfair. At 324 Md. at 570, 597 A.2d at 1368, we concluded:

"As the trial court noted, and the record indicates, medical testimony regarding time of death is fraught with uncertainty. Wiggins was aware that Dr. Korell changed her opinion once prior to the trial, and the defense had ample time to, and did, secure its own qualified expert testimony on this matter. As the ambivalence of the State's expert witness was known to the defense, her opinion at the sentencing hearing did not deprive Wiggins of a fair trial."

In January, 1993, appellant filed a petition for post-conviction relief, raising, as we said, 52 issues, several of which concerned, in one way or another, Dr. Korell's shifting views of when Ms. Lacs may have died. The only one we need be concerned with here is the argument that appellant is entitled to either a new trial or a new sentencing hearing "because his trial counsel provided ineffective assistance at the guilt phase of trial by failing to bring to light evidence of the State medical expert's prior inconsistent opinion, which dealt with the most crucial issue in [his] defense and which was consis-

tent with the defense's theory." Specifically, he claims that counsel's failure to impeach Dr. Korell or to introduce evidence regarding her prior inconsistent statement fell below the bounds of reasonable professional conduct.

Three people testified at the post conviction hearing regarding the handling of Dr. Korell. Ms. Nethercott recounted her two conversations with Dr. Korell, testifying, in that regard, to what previously had been elicited in arguments on the motion to dismiss or narrow the indictment and the motion for new trial. She added that the defense had previously retained Dr. Rudiger Breitenecker as an expert pathologist, that Dr. Breitenecker supported the defense theory that Ms. Lacs died after September 15, that when she was informed that Dr. Korell, whose initial opinion also supported that theory, had changed her opinion, she spoke with Dr. Breitenecker, who then advised that he was unwilling to testify. That combination—Dr. Korell's retraction and Dr. Breitenecker's unwillingness to testify—tore a major hole in the defense's case less than three weeks before trial. She finally was able to retain Dr. Kauffman to take the place of Dr. Breitenecker. She said that Dr. Korell did not give a good presentation at trial—that Dr. Korell had some difficulty with English and tended to be excitable. Ms. Nethercott discussed with Mr. Schlaich and with the District Public Defender, Mr. Saunders, whether she could or should testify regarding her conversations with Dr. Korell and whether, if she did, she would be able to continue as co-counsel. She determined, as a matter of strategy, to continue in the case, not to request a postponement, and not to testify about her conversations with Dr. Korell. Mr. Schlaich, she said (correctly), handled the cross-examination of Dr. Korell.

Mr. Schlaich had very little memory about the details concerning Dr. Korell. He recalled discussing with Ms. Nethercott whether she should testify and they decided that she should not do so. The major witness for appellant was a District of Columbia lawyer, Gerald Fisher, who had been involved at the post-conviction level and as co-counsel in a number of Maryland death penalty cases but had never tried

one himself, either as to guilt/innocence or as to sentencing. He expressed the belief that Mr. Schlaich and Ms. Nethercott failed to give adequate representation in a number of respects. As to Dr. Korell, he opined that "their inability or their unwillingness to confront her with contradictory statements which were crucial contradictory statements is ineffective without justification."

Judge Fader concluded that Mr. Schlaich and Ms. Nethercott "should have done something, as opposed to doing nothing, to have the impact of this inconsistent statement brought before the court," but found no prejudice. Apart from characterizing Mr. Fisher's proffer as to prejudice as "speculative," Judge Fader noted that the matter of Dr. Korell's inconsistent statement was brought to Judge Hinkel's attention and that he found the inconsistency irrelevant, and that it was brought to the jury's attention as well.

The standard to be applied in determining whether counsel's representation comported with the requirements of the Sixth Amendment is that enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Oken v. State,* 343 Md. 256, 283, 681 A.2d 30, 43 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997). To prove a claim of Constitutionally ineffective assistance of counsel, appellant must establish "that counsel's performance was deficient and that the deficient performance prejudiced the defense." *Oken, supra,* at 283, 681 A.2d at 43. To show a deficiency, appellant must (1) demonstrate that counsel's acts or omissions, given the circumstances, "fell below an objective standard of reasonableness considering prevailing professional norms," *id.,* and (2) overcome the presumption that the challenged conduct "be considered sound trial strategy." *Id.* To show that a deficiency prejudiced the defense, appellant must establish that counsel's error was "so serious as to deprive [him] of a fair trial, a trial whose result is reliable," *id.* at 284, 681 A.2d at 43, quoting from *Lockhart v. Fretwell, supra,* 506 U.S. 364, 369,

113 S.Ct. 838, 842, 122 L.Ed.2d 180, 189, quoting, in turn, from *Strickland, supra.*

 Applying those standards, we find neither a Constitutional deficiency nor Constitutional prejudice in counsel's failure to cross-examine Dr. Korell (at trial or at the sentencing proceeding) or in the decision not to have Ms. Nethercott testify with regard to her conversation with Dr. Korell. Taking the second matter first, there is absolutely nothing in this record suggesting any need for Ms. Nethercott to have testified. There is no indication whatever that, had Dr. Korell been asked about the two conversations with Ms. Nethercott, or about her conversation with Dr. Dixon, she would have denied either the fact or the content of those conversations. Ms. Nethercott's concern in that regard has utterly no foundation and should never have been a factor in deciding whether to question Dr. Korell about the matter.

 The question of whether Dr. Korell should have been cross-examined about her initial view and her change of opinion must be examined in context. Several considerations are relevant. Viewing the matter at the time of trial, it is clear that Judge Hinkel was fully aware of what had occurred. Without contradiction by the prosecutor, Mr. Schlaich had informed the judge at the hearing on the pre-trial motion to dismiss or narrow the indictment of the various conversations with Dr. Korell, and Ms. Nethercott reminded Judge Hinkel of that situation in her opening statement at trial. When Dr. Korell testified at trial, she gave a range of from 24 to 48 hours, but said that it was all guesswork and that a time of death could not be pinpointed. In Ms. Nethercott's uncontradicted view, Dr. Korell was not an effective witness; she did not make a good presentation.

More significant, perhaps, is the fact that Dr. Korell's trial testimony, giving a guesswork range of 24 to 48 hours, still put the earliest time of death at 9:00 Thursday evening—at least two hours *after* appellant was in possession of the victim's car, credit cards, and ring. Although that testimony was neither as firm nor as favorable to appellant as Dr. Korell's initial

view, it still was more *exculpatory* than *inculpatory*. Both at the time of trial and at the time of the sentencing proceeding (1989), the law in Maryland was that a prior inconsistent statement by a witness, other than a party, was admissible only to impeach the witness's credibility, and not as substantive evidence. *See Ali v. State,* 314 Md. 295, 305, 550 A.2d 925, 930 (1988); *Sun Cab Co., Inc. v. Cusick,* 209 Md. 354, 361–62, 121 A.2d 188, 191 (1956). Not until *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993) was that rule relaxed to permit an inconsistent statement to be admitted as substantive evidence if the statement was reduced to writing and either signed or otherwise adopted by the witness. Thus, Dr. Korell's initial view, expressed *orally* to Ms. Nethercott, that Ms. Lacs had died no earlier than late afternoon on Friday could not have been used as substantive evidence as to time of death but only to impeach the credibility of her testimony that (1) death could have occurred 24 hours earlier, but (2) there was no sure way to tell. To have attempted to impeach that testimony by cross-examining her about her initial view would have permitted Dr. Korell to describe her conversation with Dr. Dixon, to have acknowledged that she was wrong in her initial view, and to have explained why she was wrong. It would have placed before Judge Hinkel no information of which he was not already aware, but may have allowed Dr. Korell to strengthen her resolve about the 48 hours, which would have created an even more dramatic conflict with Dr. Kauffman's opinion.

In announcing his verdict and in denying the motion for new trial, Judge Hinkel said that he placed no weight on the medical testimony as to time of death.[10] We cannot imagine

---

**10.** Appellant contends that, had evidence of Dr. Korell's initial opinion been before Judge Hinkel, he might not have disregarded Dr. Kauffman's view that death occurred on Saturday, September 17. To a large extent, that assumes that Dr. Korell's initial opinion could have been used as substantive evidence for the proposition that it *is* possible to determine more precisely a time of death, which, as noted, is not the case. Moreover, it is clear from his remarks that Judge Hinkel was not relying on the more abstract question of whether it was possible to establish a time of death; he left in evidence that Dr. Korell could not,

what additional benefit, as a practical matter, would have accrued to appellant from further impeachment of Dr. Korell. Failure to press the point already known to Judge Hinkel does not, in our view, overcome the presumption of sound trial strategy; nor can we conclude that, as a result of the omission, "the result of the proceeding was fundamentally unfair or unreliable."

■ We have the same view with respect to the sentencing proceeding. Had the matter been pursued, it would, at best, have brought into question the credibility of Dr. Korell's testimony that death could have occurred as early as 9:00 Thursday evening which, as noted, was more helpful than harmful to the defense. Moreover, Dr. Dixon, in giving a similar opinion, told the jury about her conversation with Dr. Korell, pointing out her disagreement with the time given on the death certificate. The jury had Dr. Comparini's testimony, as substantive evidence, and it also had before it the death certificate signed by Dr. Korell, listing the time of death as Friday. Even if counsel's failure to cross-examine Dr. Korell at that proceeding could be regarded as deficient, there is utterly no basis for concluding that the result of the proceeding was fundamentally unfair or unreliable. The jury was fully aware of Dr. Korell's initial view, as noted on the death certificate, as well as her conversation with Dr. Dixon. It obviously rejected *all* of the medical testimony attempting to establish a time of death, the least favorable of which to appellant still put the earliest time of death at 9:00 Thursday evening.

### *Failure to Obtain Forensic Expert*

As we indicated above, at some point counsel consulted Dr. Breitenecker as a forensic expert to render an opinion that

---

herself, testify, within a reasonable degree of medical certainty, the earliest time of death and simply did not credit Dr. Kauffman's opinion that death occurred on Saturday, September 17. Discrediting Dr. Korell's testimony regarding *her* inability to determine more precisely a time of death would not have enhanced the credibility of Dr. Kauffman's opinion.

Ms. Lacs died no earlier than Friday, September 16. Whether they actually had retained him to testify is not entirely clear. When Ms. Nethercott learned that Dr. Korell had changed her opinion as to the earliest time of death, she called Dr. Breitenecker, who informed her then that he was unwilling to testify. That was less than three weeks before trial. She or Mr. Schlaich was then able to retain Dr. Kauffman, but Kauffman was available only for a limited period of time. According to the evidence presented in this proceeding, if the case had been tried before a jury, he would have been unavailable, thereby leaving the defense without a forensic expert prepared to opine that Ms. Lacs died on or after Friday, September 16. That influenced Nethercott and Schlaich to recommend that appellant waive a jury and have the case tried before the court.

In his post conviction petition, appellant contended that, as a result of that situation, he was effectively coerced into waiving a jury and that the waiver was not a voluntary one. Judge Fader found no merit in that argument, and it is not pursued in this appeal. The complaint here, which was also raised in the petition, is an off-shoot. Appellant contends that the choice, even if voluntarily made, was forced on him through the incompetence of counsel. The nature of that alleged incompetence is not entirely clear. It seems to rest on this statement from his expert, Mr. Fisher:

> "If indeed what was the reason for waiving was simply this whole problem with getting their experts available and being able to go forward, that I think falls below the standards of adequate professional conduct.... But they had alternatives to that. They could have sought a continuance; they could have done a number of things that would have taken the dilemma which had been created and set it aside. But they didn't do that.

> So if that was the motivating factor or the primary motivating factor in their decision to go judge versus jury then I think that that falls below the standards of competent assistance of counsel."

■ It does not appear that Mr. Fisher, or anyone else, has faulted counsel for the decision of Dr. Breitenecker not to testify, or for their decision to retain Dr. Kauffman, who gave very favorable testimony for appellant. As Fisher did not specify what other "number of things" counsel could have done, it seems that his criticism lies in their failure to seek a postponement of trial rather than recommend that appellant proceed with a court trial. As Judge Fader noted, however, appellant made clear, when questioned about his choice to proceed non-jury, that it was not based on the availability of Dr. Kauffman or anyone else, but rather on his concern that a jury might be "more likely to go with the State." Other than post-conviction afterthought, there is nothing in the record to support the claim that counsel were deficient in their selection of experts or to require a conclusion that they improperly induced appellant into waiving a jury trial.

### *Jury Selection*

In his petition for post conviction relief, appellant contended that there was a systematic exclusion of African–Americans from the jury selection process in Baltimore County. That claim was based largely on evidence that African–Americans comprise approximately 12% of the population of the county but that, at the time of his trial and sentencing, less than 6% of the venire panels were African–Americans. After taking a great deal of evidence regarding jury selection procedures in the county, Judge Fader rejected that claim, concluding that "Maryland's system of choosing jurors restricts no distinctive group from serving and favors no distinctive group to serve," and that "[n]othing Baltimore County, Maryland does deviates from the random selection system set up by the Maryland Legislature and included in the Maryland Code." See *Lovell v. State,* 347 Md. 623, 702 A.2d 261 (1997) and *State v. Calhoun,* 306 Md. 692, 511 A.2d 461 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987), where we rejected similar challenges regarding selection procedures in Talbot and Montgomery Counties.

■ In this appeal, appellant has abandoned the argument made below but has recast it as a claim of ineffective assistance of counsel. He urges now that counsel failed to investigate or present evidence regarding jury selection procedures and failed as well to object to those procedures at the sentencing hearing. The fact is that counsel did object to the array, based on the fact that, of the 104 prospective jurors on the panel, only three were African–American. What counsel did not do was to produce evidence of any systematic or unconstitutional exclusion. It is clear, however, that if counsel had done the same investigation undertaken by post-conviction counsel and produced the same evidence that they produced, in light of *Lovell* and *Calhoun* the objection would still have been properly sustained. We perceive no Constitutional prejudice to appellant from counsel's failure to pursue an unavailing defense.

### *Mitigating Evidence*

In preparing and presenting appellant's case to the jury at sentencing, trial counsel made a deliberate, tactical decision to concentrate their effort at convincing the jury that appellant was not a principal in the killing of Ms. Lacs, or at least at raising a reasonable doubt in that regard. They were, in effect, striving for "two bites at the apple." Notwithstanding that the jury would be, and was, instructed that appellant had been convicted of the crime, the jury still was required to make its own determination, unanimously and beyond a reasonable doubt, that appellant was the actual killer, and, given the entirely circumstantial nature of the State's evidence and the fact that there was some exculpatory evidence, counsel believed that appellant's best hope of escaping the death penalty was for one or more jurors to entertain a reasonable doubt as to his criminal agency.

Counsel were aware that appellant had a most unfortunate childhood. Mr. Schlaich had available to him not only the presentence investigation report prepared by the Division of Parole and Probation, which included some of appellant's social history, but also more detailed social service records

that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation. He was aware that the jury could regard that background as a mitigating factor. Indeed, as noted, one or more jurors did find appellant's "background" to be a mitigating factor, although not sufficient to outweigh the aggravating factor that they found. Mr. Schlaich understood that some lawyers use what he regarded as a "shotgun approach," attacking everything and hoping that "something sticks." He was not of that view, however, preferring to concentrate his defense. He did not, therefore, have any detailed background reports prepared, although funds may have been available for that purpose. He expressed some concern that that kind of information might prove counterproductive.

Appellant now claims that counsel's approach was a grievous error, of Constitutional dimension. Post-conviction counsel employed Hans Selvog, a Virginia social worker connected with the National Center on Institutions and Alternatives, to prepare a detailed psycho-social history of appellant, which, indeed, is tragic, rife with episodes of neglect and abuse. Appellant's legal expert, Mr. Fisher, then opined that "the use of an expert in the development of such material [is] ordinarily a minimum requirement for effective representation in a capital sentencing proceeding." On that premise, he concluded that, by failing to retain someone like Mr. Selvog to prepare a detailed psycho-social history and by failing to present information of that kind to the jury, trial counsel did not meet the minimum standards of the profession. Although he said that he had an opinion as to whether the presentation of a report like the one prepared by Mr. Selvog would have had an effect on the sentencing jury, Judge Fader would not let him render that opinion, finding it entirely too speculative. Nonetheless, appellant urges in his brief before us that there is a substantial or significant possibility that he was sentenced to death "because of his counsel's failure to investigate, develop, or present powerful mitigating evidence of [appellant's] background and mental deficiencies."

Appellant cites a number of cases for the proposition that the failure to investigate and present available evidence of a mitigating factor may constitute ineffective assistance of counsel, arguing that the "Constitution imposes this virtually mandatory duty to investigate mitigating evidence." He asserts that the failure to marshal and present this evidence cannot be justified as a tactical decision, for if it was a tactical decision, "that decision was patently unreasonable." His view thus appears to be that, in every capital punishment case, it is mandatory for counsel to prepare and present to the sentencing tribunal any evidence that could be used by the tribunal to find a mitigating circumstance, and certainly any evidence of the defendant's abusive childhood. A dysfunctional background, while not one of the seven mitigating factors specifically listed in Article 27, § 413(g), may constitute a mitigating factor under the catchall in § 413(g)(8)—"[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." At least implicit in his argument, and really explicit, is the principle that counsel may not make the kind of tactical decision made in this case—to concentrate their defense and not employ a "shotgun approach," in the hope that "something sticks."

■ We reject the argument in the broad form that it is presented. In the first place, as noted, counsel *did* investigate and *were* aware of appellant's background. They did not have as detailed or graphic a history as was prepared by Mr. Selvog, but that is not a Constitutional deficiency. *See Gilliam v. State*, 331 Md. 651, 680–82, 629 A.2d 685, 700–02 (1993), *cert. denied*, 510 U.S. 1077, 114 S.Ct. 891, 127 L.Ed.2d 84 (1994); *Burger v. Kemp*, 483 U.S. 776, 788–96, 107 S.Ct. 3114, 3122–26, 97 L.Ed.2d 638, 653–58 (1987). More important, counsel *does* have leeway in making strategic and tactical decisions about how to present a case at a capital sentencing hearing. Counsel is *not* required to present every conceivable mitigation defense if, after proper investigation and review, he or she concludes that it is not in the defendant's best interest to do so. *See Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Harris v. Dugger*, 874 F.2d 756,

763 (11th Cir.), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989) (attorney not obligated to present mitigating evidence if, after reasonable investigation, he or she determines that such evidence may do more harm than good).

The cases cited by appellant for his broad proposition that the failure of counsel to investigate or present mitigating evidence at a capital sentencing hearing constitutes ineffective assistance are all distinguishable. As a preliminary note, in all but one of them the sentencing tribunal, whether judge or jury, was the same tribunal that had determined guilt and thus had already considered and ruled upon the defendant's criminal agency. That is not, of course, a necessarily governing distinction, but it is a factor to consider. There is certainly less advantage to focusing the effort on retrying criminal agency before the very tribunal that has already determined it beyond a reasonable doubt, to the exclusion of other defenses going more directly to discretionary sentencing considerations, than in presenting and focusing upon that issue before a new, untainted tribunal. The cases cited are distinguishable for other reasons as well. In some of them, counsel made no investigation at all of any mitigating circumstances; in others, counsel failed to make a particular inquiry that would have produced significant, highly relevant mitigating evidence. Under the circumstances presented, that failure, the courts held, was not the product of a reasoned strategic decision but simply deficient. *See, for example, Hill v. Lockhart,* 28 F.3d 832 (8th Cir.1994), *cert. denied,* 513 U.S. 1102, 115 S.Ct. 778, 130 L.Ed.2d 673 (1995) (no investigation of significant psychiatric history, including positive reaction to anti-psychotic medication); *Austin v. Bell,* 126 F.3d 843 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998) (no mitigation evidence presented; no investigation made of mitigating circumstances); *Hendricks v. Calderon,* 70 F.3d 1032 (9th Cir.1995), *cert. denied,* 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996) (no investigation into any mitigating evidence; decision made simply to beg for mercy); *Antwine v. Delo,* 54 F.3d 1357 (8th Cir.1995), *cert. denied,* 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996) (failure to investigate

defendant's mental condition at time of murder though aware of his odd behavior; defendant found to have bipolar disorder); *Baxter v. Thomas*, 45 F.3d 1501 (11th Cir.1995), *cert. denied*, 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995) (no investigation of defendant's significant psychiatric history, including three-year commitment to State mental hospital, though counsel aware of odd behavior); *Com. v. Smith*, 544 Pa. 219, 675 A.2d 1221 (Pa.1996), *cert. denied*, 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997) (failure to investigate defendant's mental state; defendant tortured to death five-month-old baby); *Hildwin v. Dugger*, 654 So.2d 107 (Fla.), *cert. denied*, 516 U.S. 965, 116 S.Ct. 420, 133 L.Ed.2d 337 (1995) (failure to discover previous psychiatric hospitalizations and suicide attempts); *Rose v. State*, 675 So.2d 567 (Fla.1996) (no meaningful investigation of defendant's background; failure to discover evidence of organic brain damage and schizoid personality); *State v. Brooks*, 661 So.2d 1333 (La.1995) (failure to discover mental condition relevant to whether defendant under domination of homosexual lover); *People v. Ruiz*, 177 Ill.2d 368, 226 Ill.Dec. 791, 686 N.E.2d 574 (Ill.1997) (no investigation at all into defendant's background); *People v. Howery*, 178 Ill.2d 1, 227 Ill.Dec. 354, 687 N.E.2d 836 (Ill. 1997), *cert. denied*, — U.S. —, 119 S.Ct. 77, 142 L.Ed.2d 60 (1998) (failure to present evidence of defendant's significant contributions to community and civic involvement); *People v. Steidl*, 177 Ill.2d 239, 226 Ill.Dec. 592, 685 N.E.2d 1335 (Ill. 1997) (no preparation at all for sentencing hearing).

■ The circumstances presented in those cases, and others like them, are not at all what we have here. Counsel made a reasoned choice to proceed with what they thought was their best defense. They knew that there would be at least one mitigating factor—the uncontested fact that appellant had not previously been convicted of a violent crime—should the jury not credit their attack on criminal agency. It was not unreasonable for them to choose not to distract from their principal defense with evidence of appellant's unfortunate childhood. As Mr. Schlaich noted, the dysfunctional and abused childhood defense is not always successful; judges and

juries have condemned to death defendants with equally tragic childhoods. Appellant's attack runs afoul of the principle set forth in *Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95, applied by us in *State v. Thomas*, 325 Md. 160, 171, 599 A.2d 1171, 1176 (1992), *cert. denied*, 508 U.S. 917, 113 S.Ct. 2359, 124 L.Ed.2d 266 (1993), and *Oken v. State*, *supra*, 343 Md. 256, 283–84, 681 A.2d 30, 43:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "

### *Alleged Agreement With Geraldine Armstrong*

██ "[I]n order to preserve the issue for any future review," appellant contends that the State failed to disclose an agreement to treat his girlfriend, Geraldine Armstrong, leniently. Armstrong was arrested with appellant and was initially charged with felony murder, theft, and fraud, the belief being that she was in complicity with appellant in the robbery and murder of Ms. Lacs. The charges against her were eventually dropped, and she testified for the State against appellant. From those circumstances, appellant claims that "there is a significant possibility that Ms. Armstrong received assurances of leniency in exchange for her testimony" that were not disclosed to appellant. No evidence

of any such assurances was presented. Both the prosecutor and Ms. Armstrong denied that any agreement or assurances existed, and Judge Fader found as a fact that there was no basis for the allegation. That finding is not clearly erroneous.

### Sufficiency of Evidence

Also "to preserve the issue for any future review," appellant urges that no reasonable fact finder could have found him guilty beyond a reasonable doubt either at trial or at the sentencing proceeding. That question was litigated and resolved by us in appellant's direct appeal. We held that the evidence did suffice to sustain the conviction and the sentence, and we shall not revisit that issue in a post conviction proceeding. Md.Code, Article 27, § 645A(b).

ORDER DENYING PETITION FOR POST CONVICTION RELIEF AFFIRMED, WITH COSTS.

Dissenting opinion by ELDRIDGE, J., in which BELL, C.J., joins.

ELDRIDGE, Judge, dissenting.

Under the Maryland death penalty statute, with one exception not pertinent to this case, "only a principal in the first degree" to murder in the first degree is eligible for a death sentence. The State, at the sentencing stage of the trial, must prove beyond a reasonable doubt that the defendant was the actual perpetrator of the murder. *See* Maryland Code (1957, 1996 Repl.Vol.), Art. 27, § 413(e)(1); Maryland Rule 4–343(g); *Wiggins v. State,* 324 Md. 551, 570–571, 597 A.2d 1359, 1368 (1991), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992); *Johnson v. State,* 303 Md. 487, 510, 495 A.2d 1, 12 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Stebbing v. State,* 299 Md. 331, 371, 473 A.2d 903, 923, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).

When this case was before us on direct appeal, Judge Cole and I dissented from the affirmance of the death penalty on the ground that the evidence at the sentencing hearing was

insufficient, under the due process standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 318–319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560, 573 (1979), for the jury to find, beyond a reasonable doubt, that Kevin Wiggins was a principal in the first degree to the murder of Florence Lacs. *Wiggins v. State, supra,* 324 Md. at 583–588, 597 A.2d at 1374–1377 (Judges Eldridge and Cole dissenting). While observing that the State's evidence "may have been sufficient to establish that Wiggins was involved in the robbery of Ms. Lacs, it was not sufficient to show, beyond a reasonable doubt, that Wiggins was the *actual perpetrator of the murder.*" 324 Md. at 585, 597 A.2d at 1375. The dissenting opinion on direct appeal reviewed the State's extremely weak circumstantial evidence, the lack of evidence showing that the victim died at about the time Wiggins was seen in the vicinity of the victim's apartment, the time sequence problem with the State's case, the evidence conflicting with the State's theory of the case, the lack of any evidence that Wiggins had been in the victim's apartment, and the evidence suggesting that someone else had been in the apartment at the critical time and had been involved in the robbery/murder.

As the evidence and the weakness in the State's case were extensively reviewed in the dissenting opinion on direct appeal, I shall not repeat that review today. For the reasons set forth in that dissenting opinion, I adhere to the view that the evidence was utterly insufficient to show that Wiggins was the actual perpetrator of the murder. Consequently, as a matter of Maryland law, he is not eligible for the death penalty. The maximum punishment which may legally be imposed upon Wiggins is life imprisonment. Code (1957, 1996 Rep. Vol.), Art. 27, § 412(b).

The majority today does not discuss this issue, presumably because it was litigated on direct appeal and because the Maryland Post Conviction Procedure Act, Code (1957, 1996 Repl.Vol.), Art. 27, § 645 A(a), ordinarily is not a vehicle for relief based on an issue which has "been previously and finally litigated...."

Nevertheless, this issue directly concerns the legality of Wiggins's sentence. An issue concerning the legality of the sentence imposed is not "finally" litigated when decided on direct appeal because, under Maryland law, a "court may correct an illegal sentence at any time." Maryland Rule 4–345(a). As stated by the Court in *State v. Griffiths*, 338 Md. 485, 496, 659 A.2d 876, 882 (1995), "[t]his Rule creates a limited exception to the general rule of finality, and sanctions a method of opening a judgment otherwise final and beyond the reach of the court." The Court in *Griffiths* went on to point out that "Rule 4–345(a) does not preclude action by the trial court on its own initiative, and we have in the past *ex mero motu* directed the trial court to correct an illegal sentence upon remand." *Ibid.*

Since Wiggins was not shown to be a principal in the first degree, the death sentence is an illegal sentence under Maryland law. Furthermore, the imposition of a death sentence, in light of the evidence, is a denial of due process under *Jackson v. Virginia, supra.* I would remand this case to the circuit court with directions to impose a sentence of life imprisonment.

Chief Judge BELL concurs in this dissenting opinion.