(No. 79505.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. LUIS RUIZ, Appellee.

*Opinion filed September 25, 1997.*

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley and Richard A. Devine, State's Attorneys, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Richard H. McLeese, of Thomas D. Decker & Associates, Ltd., of Chicago, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

The State appeals from an order of the circuit court of Cook County granting defendant, Luis Ruiz, relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 *et seq.* (West 1992)). The circuit court vacated defendant's death sentence and ordered a new sentenc-

ing hearing, concluding that defendant had been denied effective assistance of counsel at his original capital sentencing hearing. "Because the post-conviction proceedings involve a judgment imposing the death penalty, the State's appeal lies directly to this court." *People v. Mack,* 167 Ill. 2d 525, 528 (1995); 134 Ill. 2d R. 651(a); see also *People v. Joyce,* 1 Ill. 2d 225, 227 (1953) (order granting post-conviction relief is a final judgment from which State may appeal). For the reasons set forth below, we affirm.

Early on the morning of February 25, 1979, the bodies of three teenage males, Michael Salcido, Arthur Salcido and Frank Mussa, were discovered in a car in a Chicago alley. Defendant and codefendant Juan Caballero were tried before one judge supervising two separate juries; both men were found guilty on charges of murder, unlawful restraint, and armed violence with respect to each of the three victims. The State requested a death penalty hearing in each case. Defendant waived a jury and, after hearing evidence in aggravation and mitigation, the trial court sentenced him to death.

On direct appeal, this court affirmed defendant's convictions and death sentence (*People v. Ruiz,* 94 Ill. 2d 245 (1982)), and the United States Supreme Court denied review (*Ruiz v. Illinois,* 462 U.S. 1112, 77 L. Ed. 2d 1341, 103 S. Ct. 2465 (1983)). Defendant then instituted the present action under the Act, filing a *pro se* petition for post-conviction relief which was later supplemented and amended by appointed counsel. The State's motion to dismiss the petition was granted by the circuit court, and defendant appealed. This court, without reaching other issues, vacated the circuit court order dismissing defendant's post-conviction petition and remanded with directions that a judge other than the judge who had presided over defendant's trial should consider the petition. *People v. Ruiz,* 107 Ill. 2d 19 (1985).

Following the remand, defense counsel submitted a group of affidavits in support of the post-conviction petition and renewed his request for an evidentiary hearing. The State relied on its original motion to dismiss, and after a hearing on that motion, the circuit court dismissed defendant's petition. Once again, defendant appealed.

In its third opinion in this case, this court rejected all but one of the arguments raised by defendant in his post-conviction petition. This court focused on the contention that defendant's trial counsel was ineffective at the capital sentencing hearing because he "failed to investigate possible sources of mitigating evidence and failed to introduce favorable evidence that was readily available." *People v. Ruiz*, 132 Ill. 2d 1, 21 (1989). More specifically, this court stated:

"The defendant alleges that counsel failed to investigate the defendant's personal history and failed to inquire of the defendant or his family members whether they were aware of mitigating information that could be used at the sentencing hearing. The defendant concludes that counsel was ineffective in failing to conduct such an investigation and to present the readily available information." *Ruiz*, 132 Ill. 2d at 24.

This court reasoned that favorable testimony from defendant's family members and friends might have supported the defense theory at the sentencing hearing that defendant was not an active or willing participant in the offenses. *Ruiz*, 132 Ill. 2d at 26. The court further noted that this testimony would have provided a portrayal of defendant that was not apparent from the evidence already admitted, and that the record did not suggest any reasons for not presenting the evidence. *Ruiz*, 132 Ill. 2d at 26. The court therefore concluded:

"In light of the unchallenged and unheard allegations in the defendant's post-conviction petitions, we are not prepared to assume that the course chosen by counsel was justified. Counsel has a duty to investigate potential

sources of mitigating evidence, or to have reason not to make such an investigation; according to the allegations before us, counsel inexplicably failed to conduct such an investigation. We do not mean to suggest, however, that trial counsel was required to formally interview each family member and friend; it may be that in discussions with those persons counsel was made aware of their testimony and of their value as witnesses. But, on the present record, we are unable to conclude that counsel's course was reasonable, or that he had some other valid strategy in mind. *** An evidentiary hearing on the allegations is warranted, and we therefore remand the cause to the circuit court for an evidentiary hearing on these portions of the defendant's petitions for post-conviction relief." *Ruiz*, 132 Ill. 2d at 27-28.

At the evidentiary hearing, defendant's trial counsel, Michael Green, testified that he had no recollection of representing defendant at his sentencing hearing 14 years earlier, although Green believed that it was his first capital sentencing hearing. Green also did not remember if, prior to the sentencing hearing, he had interviewed defendant or his family regarding defendant's background. However, Green surmised that, given defendant's criminal record and history of gang affiliation, such mitigation would have been futile and would have opened up possibly damaging avenues of cross-examination to the State. The following colloquy then occurred:

"MR. NIGRO [Assistant State's Attorney]: Did you ordinarily made [*sic*] a consideration based upon the individual's background as to whether to call or not to call family members to testify as mitigation witnesses at the sentencing hearing?

MR. GREEN: I think it depends on the facts of a particular case. I would have to evaluate the pros and cons, discuss it with my client, and discuss it with his family. *** Did I do it here? I don't know.

MR. NIGRO: Would it have been your practice at the time to acquire information concerning the defendant's

social history and then make a determination as to whether or not you wanted to call family members to testify as mitigation witnesses?

\* \* \*

MR. GREEN: That is something that depends on the individual case."

Defendant's mother, Carmen Ruiz, testified that she had nine children, of whom defendant was the second oldest. In addition to defendant, her sons Michael and Richard were also in prison. She recalled defendant's murder trial and was present for it and the sentencing hearing. Mrs. Ruiz stated that Green had asked her nothing about defendant, his background, or persons who might be able to offer information concerning defendant. While she and other family members had short conversations with counsel during trial, he did not ask about defendant's background. She did not speak to Green between defendant's conviction and sentencing, and in conversations at the sentencing hearing he asked her nothing about defendant or his background.

Mrs. Ruiz further testified concerning her husband's criminal record, his involvement in the so-called "numbers racket," and his practice of carrying knives on his person. She also stated that her husband was a heavy drinker when defendant was a child and that he had beaten defendant and forced him to kneel on a sharp cooking utensil, like a grater. When defendant was 14 years of age, the family moved to a new neighborhood and Mrs. Ruiz went back to work full time, leaving defendant with no parental supervision. Defendant was shot in the arm at age 15.

Mrs. Ruiz testified that Green had never asked her about her husband's criminal activity, his drinking and abuse of defendant as a child, or what defendant was like in the family. She described defendant as "special," helpful and loved by his family, and stated that he could always make her laugh. Mrs. Ruiz further stated that

defendant had expressed remorse about the murders while in prison and had attempted to warn his brothers against gang involvement. Green also had not asked her about these matters. If asked, she would have been willing to testify at defendant's capital sentencing hearing. On cross-examination, Mrs. Ruiz testified that she knew that defendant had been charged with murder in 1976, but denied that she had seen him carry any weapons or that she knew he was a gang member.

Three of defendant's sisters, Carmen Vazquez, Gloria Ruiz and Beverly Ruiz, each testified that they had never spoken to defendant's attorney about defendant or his background during the time surrounding his trial and sentencing hearing, although they had attended both proceedings. Each further stated that she would have been willing to discuss defendant's background with Green and to testify at the sentencing hearing if he had asked. More specifically, Carmen Vazquez testified that defendant was a loving and thoughtful brother who had taken her to see her first Chicago Cubs game and to see Santa Claus when her father told her that she could not go. She stated that her father and several siblings had taken drugs.

Gloria Ruiz testified that her father had beaten the children; that when the family moved to the Janssen and Grace neighborhood, members of the Latin Eagles gang harassed defendant; and that defendant was a follower, not a leader. On cross-examination, Gloria stated that she was aware that defendant used drugs in 1980, but denied that she used drugs at the time. She was impeached with her 1993 affidavit, in which she admitted that she had used cocaine once a week for eight or nine years beginning in 1980. In 1980, Gloria was aware that defendant was a member of the Latin Kings gang, and that their brother Michael was a member of the Puerto Rican Stones gang.

Beverly Ruiz testified that when she was a small child she was afraid of cockroaches, and that while her other siblings would tease her about that, defendant comforted her and told her that everything was going to be all right. She stated that defendant expressed sorrow for these murders when she saw him in the Cook County jail awaiting trial. On cross-examination, Beverly testified that at the time of defendant's trial she was 14 years of age, and at that time she knew that defendant and their brother Michael were gang members.

Defendant's former baseball coach, Jose Lugo; defendant's former neighbor, Flurette Martin; and a friend's father, Robert Segura, each testified to defendant's good character and stated that they would have so testified at the sentencing hearing had defendant's attorney asked them to do so. On cross-examination, each stated that while they knew defendant in 1976, they did not know that he had been arrested for murder, or that he was a gang member.

Maria Escalante, who was defendant's former girlfriend and the mother of his daughter Jessica, testified that she was present at the sentencing hearing and for parts of defendant's trial, but had never spoken to Green. Escalante stated that defendant was a warm and loving person who encouraged her not to have an abortion when she was pregnant with Jessica, and who cared for her during her pregnancy. When Jessica was a baby, defendant was loving and affectionate toward the infant and helped care for her. Escalante would have been willing to testify to these matters at the sentencing hearing. On cross-examination, Escalante admitted that when she became pregnant in 1977, she knew defendant was a gang member and had been arrested in 1976 for murder. After Jessica's birth, defendant continued his gang activities. Escalante stated she had seen defendant use marijuana, and had smoked it with him on occasion.

Defendant's older brother, Michael Ruiz, testified that he was currently imprisoned at the Big Muddy Correctional Center in Illinois, serving a criminal sentence following his violation of probation. Michael stated that he had attended some of defendant's trial, but had never spoken to his attorney, Green. Michael testified that, from the time he and defendant were small children, their father had been involved in "the numbers racket" and there were occasions, when defendant was at home, when the police came to their house looking for their father or to search for gambling paraphernalia. Their father drank heavily and used marijuana, sometimes smoking it with Michael and defendant. Their father beat defendant, and sometimes made him kneel on a spiked cooking utensil.

Michael further testified that, when defendant was 11 years old, Michael introduced him to a gang known as the Buckingham Boys, and to alcohol and drugs including marijuana and acid. Michael later became a member of the Puerto Rican Stones and defendant was with Michael on occasions when he sold drugs for that gang. In 1973, the Ruiz family moved to Janssen and Grace Streets, where several gangs were active, including the Simon City Royals and the Latin Eagles.

Michael stated that his first contact with the criminal justice system was when he was convicted of assault in the seventh grade for breaking a boy's ribs with a baseball bat. At age 14 or 15, he was arrested for carrying a gun, and has subsequently been convicted of numerous felonies. In the 1970s, Michael was an enforcer for the Puerto Rican Stones, passing out guns, making certain things functioned smoothly, and shooting people when it was necessary. On cross-examination, Michael testified that he had been in a gang since he was 12, and at age 36 he was still in a gang. While he had not killed anyone, he believed he had shot four or five persons.

Defendant testified in his own behalf that he was 35 years of age and had dropped out of high school in his second year. Defendant stated that he was 19 years old when these murders occurred, and 20 at the time of his trial in 1980. His attorney, Michael Green, discussed the details of his case with him on a daily basis during trial, but never asked defendant about his background, what his school records might have shown, or about people who might be able to supply information about him. Defendant testified that, during the 30-day period between his conviction and sentencing, Green came to see him once, and the only matter discussed at that meeting did not involve Green's strategy or plans for the sentencing hearing.

Defendant next saw Green on the day of sentencing, when Green told defendant he was going to call a police officer on his behalf. Defendant stated that neither before nor during the sentencing hearing did Green ask about his background, have him sign a release for his school records, ask about people who knew defendant's background, or ask if on the day of the crimes defendant had consumed any drugs or alcohol. Defendant stated that he never told Green that he did not want him to investigate his background and Green never told defendant of any strategy he had which would not require such an investigation. Green had explained to defendant his right to testify at trial, but had not told him that he had such a right with respect to the sentencing hearing. If, after conferring with Green, they had decided it was in defendant's interest to testify at the sentencing hearing, he would have been willing to do so.

Defendant then testified regarding his background, stating that he had had difficulty in school, could not read or spell well, and that this made him feel stupid. He was never told that he was learning disabled or offered any special courses or help in school. He would

have been willing to discuss this matter with Green, and to undergo a mental health evaluation had counsel suggested it. Defendant would also have been willing to discuss with Green: (1) his father's participation in illegal gambling; (2) his father's physical abuse of defendant; and (3) his father's use of alcohol and marijuana, and his allowing defendant to accompany him to bars and drink when he was underage.

Defendant confirmed his older brother Michael's testimony that, when defendant was 11 years of age, Michael introduced him to alcohol, narcotics, and to a gang known as the Buckingham Boys which later became the Puerto Rican Stones. Defendant stated that this was a violent gang whose members killed Latin Eagles gang members. Michael was an enforcer or "shooter" for that gang, and would hide his gun in a hole behind defendant's bed. Defendant was once "jumped" in the lunchroom at his high school by Lady Eagles, one of whom told him that Michael had shot her brother. Defendant testified that while still in grade school he joined a gang for protection from the Simon City Royals, who had once beaten him up in an alley. Defendant expressed remorse for what had happened to the Salcido brothers and Frank Mussa. He stated that he loved and was interested in his daughter. Defendant would have been willing to speak to counsel about any of these matters.

On cross-examination, defendant stated that he had repeated the first grade, but had passed in all subsequent years and had voluntarily quit high school in his second year. Defendant stated that he wanted to be a member of a gang, and that he enjoyed and was proud of being a gang member. Defendant was a Spanish Gangster for four or five years, and then became a Latin King, which was a larger, better organized gang. In 1976, defendant signed a statement admitting that he shot Thomas Gro-

bel because he wanted to "hit" a Simon City Royal. He had fired a rifle into a crowded parking lot, knowing he was likely to strike someone.

On redirect examination, defendant testified that he still has difficulty with reading comprehension and that he had failed most of his high school classes. Defendant stated that, after the family moved to Janssen and Grace, his brother remained in their old neighborhood and was not there to protect defendant when he was beaten by the Simon City Royals and harassed by the Latin Eagles. Defendant had been shot in the arm at age 15 by the Simon City Royals, and several of his friends were also shot in the months preceding the shooting of Grobel. That night was the first time he had handled a gun, and his intent was to "shoot somebody as we had been shot."

The defense also called several expert witnesses at the evidentiary hearing. Appolon Beaudouin testified that he had a master's degree in criminal justice and was employed as a mitigation specialist with the Capital Resource Center, a part of the office of the State Appellate Defender, to analyze and investigate potential mitigation evidence in capital cases. Beaudouin had prepared a chart, which he used as demonstrative evidence, that summarized the mitigating evidence in defendant's favor. He had garnered this information from documents submitted by the defense pertaining to defendant's social history, and had also interviewed defendant, his parents and older brother.

Irving Spergel, a professor at the University of Chicago's School of Social Services who specializes in youth gangs, testified that he had reviewed certain materials concerning defendant's social history. Spergel opined that because of defendant's background and childhood, he was highly vulnerable to participation in youth gangs and gang-related violence.

John Paul Bederka, a toxicologist, testified that he had done a toxicological evaluation of defendant for the dates of these murders, February 24-25, 1979. Although defendant was not tested on those dates, based on Bederka's years of experience he could evaluate defendant using the affidavits submitted by the defense. Bederka then opined that, on the night of the murders, defendant was under the influence of alcohol and several drugs which would have resulted in confusion, unreal perceptions, and possibly impulsive and aggressive behavior. A toxicologist with the materials Bederka had before him could have given a similar evaluation in 1980.

Finally, Michael Gelbort, a clinical psychologist, testified that he had performed a neuropsychological examination of defendant by administering a battery of tests, reviewing medical and Department of Corrections records and interviewing him. Gelbort stated that, in his opinion, defendant had cognitive dysfunction, dysfunction in the left central hemisphere of the brain, diffuse misfunction of the frontal lobe, and several other problems "peppered throughout the brain." Based on the history which he took from defendant, he concluded that defendant's condition in 1979 was much the same. Gelbort testified that if defendant were entering the school system at this time, he would be considered learning disabled. After reviewing a court opinion summarizing the facts of the offenses involved herein, Gelbort concluded that defendant's neuropsychological dysfunctions could have contributed to his participation in such violent behavior. Gelbort stated there is no reason why a neuropsychological evaluation of this type could not have been performed in 1980.

Following arguments by counsel for both parties, the circuit court concluded that, considering all of the evidence, defendant had proven his allegations of inef-

fective assistance of counsel at sentencing. Accordingly, the circuit court granted defendant's post-conviction petition.

In the present appeal, the State contends that the circuit court's decision granting defendant a new capital sentencing hearing should be reversed because: (1) the post-conviction hearing conducted by the circuit court went far beyond the scope of the mandate of this court on remand; and (2) even considering all of the evidence presented at the post-conviction hearing, defendant has failed to demonstrate, under the criteria set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), that he received ineffective assistance of counsel at his original capital sentencing hearing. We disagree.

> "As noted by the State, there are numerous cases which hold that a trial court must obey the clear and unambiguous directions in a mandate issued by a reviewing court. [Citations.] *** Thus, when a reviewing court issues a mandate, it vests the trial court with jurisdiction to take only such action as conforms to that mandate. [Citations.] Any other order issued by the trial court is outside the scope of its authority and void for lack of jurisdiction. [Citation.]" *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276-77 (1982).

The State maintains that the mandate on remand from this court was for the limited purpose of determining "if counsel was adequate at the sentencing hearing in that he had not called family members as mitigation witnesses and whether counsel had contacted those persons, or had a reason for not doing so." Therefore, the State argues, it was completely beyond the scope of the mandate for the circuit court to allow the hearing to include "almost every possible subject of mitigation which might be presented in an Illinois death penalty sentencing hearing."

However, the language of the mandate at issue is much broader than the State suggests, declaring:

"The cause is remanded to the circuit court for an evidentiary hearing on those portions of the defendant's post-conviction petitions that allege that the defendant was denied the effective assistance of counsel because of trial counsel's failure to *investigate additional sources of mitigating evidence and present the evidence* at the capital sentencing hearing." (Emphasis added.) *Ruiz*, 132 Ill. 2d at 28.

Thus, we believe the mandate, properly read in the context of this court's opinion, directed the circuit court to conduct a hearing to determine if counsel had provided ineffective assistance in failing to: (1) inquire whether defendant, his family and friends possessed knowledge of potentially mitigating evidence; (2) investigate the information they provided; and (3) present any strategically advantageous evidence to the sentencing body.

The Act gives the post-conviction court wide latitude to receive proof by affidavits, depositions, oral testimony or other evidence. 725 ILCS 5/122—6 (West 1992); *People v. Watson*, 50 Ill. 2d 234, 236 (1972). Indeed, "[t]he hearing on a post-conviction petition is a new and independent investigation, with the hearing court authorized and required to use any proper procedure necessary and appropriate in order to discharge its duty of determining the existence or nonexistence of facts which would constitute a denial of a claimed constitutional right." *People v. Wakat*, 415 Ill. 610, 616-17 (1953).

In *People v. Perez*, 148 Ill. 2d 168 (1992), the defendant received a post-conviction evidentiary hearing wherein he claimed, *inter alia*, that he had received ineffective assistance of counsel at his capital sentencing hearing due to his counsel's failure to investigate mitigation evidence about his family and to introduce mitigating evidence counsel possessed. At that hearing, the court heard testimony from three witnesses: (1) the defendant's trial counsel, who testified regarding his ef-

forts to garner and present mitigating evidence on behalf of the defendant; (2) an investigator/social worker enlisted by post-conviction counsel to investigate the defendant's background, including interviewing him and his family and reviewing prison and school records; and (3) an expert on death penalty litigation, who testified that "[e]xperts such as neurologists, psychiatrists, sociologists and social workers should be consulted, where indicated, with a view to 'putting together all [the] pieces into some kind of psychological or sociological picture [of defendant].' " *Perez*, 148 Ill. 2d at 171, 178, 183-84. In reversing the post-conviction court's denial of relief, this court found trial counsel's failure to investigate and present evidence of the defendant's mental history and background required vacating his death sentence and remanding for a new sentencing hearing. *Perez*, 148 Ill. 2d at 185-86.

Here, pursuant to this court's remand, the circuit court conducted a post-conviction evidentiary hearing wherein it considered the oral testimony previously summarized; documentary evidence, including numerous affidavits; and legal memoranda submitted by both parties. While this evidence was wide-ranging, we do not believe the circuit court went beyond the authority granted by the reviewing court's mandate, where, as in *Perez*, the evidence all flowed from the personal history and background information which defendant claimed was never investigated or presented.

We next address whether the circuit court erred in finding that defendant had been denied the effective assistance of counsel at his capital sentencing hearing. The parties agree that the applicable standard of review is whether the post-conviction court's determination is manifestly erroneous. See *People v. Silagy*, 116 Ill. 2d 357, 365 (1987). The term "manifest error" has been interpreted to mean error which is clearly evident,

plain, and indisputable. See *People v. Hightower*, 258 Ill. App. 3d 517, 519 (1994). Applying this standard to the instant case, we find that the circuit court's conclusion that defense counsel was ineffective was not manifestly erroneous.

Whether a defendant received effective assistance of counsel is governed by the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), which this court adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984). In *People v. Franklin*, 135 Ill. 2d 78 (1990), this court discussed the *Strickland* test and set forth what a defendant must show to prevail on such a claim:

> "(1) that his counsel's performance was so deficient as to fall below an objective standard of reasonableness under 'prevailing professional norms'; and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. [Citation.] To establish the deficiency of counsel's performance, the defendant must overcome the 'strong presumption' that his counsel's representation fell within the 'wide range of reasonable professional assistance.' [Citation.] As such, 'strategic choices made after *thorough investigation* of law and facts relevant to plausible options are virtually unchallengeable.' " (Emphasis added.) *Franklin*, 135 Ill. 2d at 116-17, quoting *Strickland*, 466 U.S. at 688, 689, 80 L. Ed. 2d at 693-94, 694-95, 104 S. Ct. at 2064-65, 2065.

Where an adequate investigation has been conducted, the failure to present mitigating evidence does not itself establish that defense counsel was ineffective. *People v. Coleman*, 168 Ill. 2d 509, 535 (1995); *Perez*, 148 Ill. 2d at 186. "An informed decision not to present certain mitigating evidence may represent a valid strategic choice, particularly where the evidence is potentially damaging. However, where counsel has neglected to conduct a proper investigation into mitigating circumstances, the failure to introduce mitigating evidence cannot be attributed to strategy." *Coleman*, 168 Ill. 2d

at 535; see also *Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995) (a "strategic" decision cannot be reasonable when counsel has failed to investigate his options and make a reasonable choice between them). In such cases, counsel's performance falls below objective standards of reasonableness. *Coleman*, 168 Ill. 2d at 536.

Here, the circuit court's determination that defense counsel's performance was deficient was supported by the evidence. Defendant introduced numerous witnesses who said they would have testified in mitigation had they been contacted. The court found some of these witnesses to be credible. Counsel, on the other hand, stated that he could not recall what occurred at the sentencing hearing, and that it would have "depend[ed] on the individual case" whether he acquired a defendant's social history before deciding whether to call family members to testify in mitigation. Thus, it was not manifest error to conclude that counsel had failed to investigate defendant's background, and that his decision not to present such evidence at the sentencing hearing could not be deemed a strategic decision. See *Perez*, 148 Ill. 2d at 190.

Moreover, in addition to failing to undertake even a minimal investigation of defendant's background and character, the evidence indicated that counsel: (1) failed to obtain the assistance of anyone else in investigating and analyzing potential mitigation issues; (2) failed to introduce any documentary evidence in mitigation, such as defendant's school records or the criminal records of his father and older brother; and (3) failed to obtain evaluations by experts, such as neurologists, toxicologists, or sociologists, to analyze and interpret potential mitigation evidence. In fact, counsel introduced only one witness in mitigation, an interrogating police officer who testified that defendant cried upon seeing the photographs of the three murder victims.

We conclude that counsel's failure to investigate and present mitigating evidence, which a thorough investigation of defendant's background would have revealed, was representation which fell below objective standards of reasonableness under prevailing professional norms. See *Perez*, 148 Ill. 2d at 191. The circuit court therefore correctly found that defendant had satisfied the first prong of the *Strickland* analysis. See *Perez*, 148 Ill. 2d at 194 (defendant satisfied first prong of *Strickland* by showing counsel's failure to investigate and present to sentencer defendant's mental history and his failure to investigate defendant's background with the information he possessed).

We must now determine whether the circuit court correctly found that the second prong of the *Strickland* analysis was met, *i.e.*, that counsel's deficient performance so prejudiced the defense as to deny defendant a fair sentencing hearing. "Mitigating evidence is extremely important under the Illinois capital sentencing scheme. Once an aggravating factor is found sufficient to impose the death penalty, there must be mitigating evidence sufficient to preclude the imposition of the death penalty." *Perez*, 148 Ill. 2d at 194. Here, as in *Perez*, while a minimal amount of mitigating evidence was presented at defendant's sentencing hearing, a great deal of mitigating evidence existed which counsel failed to investigate and introduce. The resulting prejudice to defendant is clear.

In presenting its findings at the evidentiary hearing, the circuit court set forth the evidence it considered to be "clearly" mitigating, stating:

"that at the time of the murders the defendant was 19 years of age; that the defendant did not actually kill any of the victims, rather he was guilty under the theory of accountability; that *** when the defendant was younger his father was physically abusive, his father was involved in organized crime, his father took drugs and also did

drugs with the defendant himself when the defendant was between the ages of 11 and 14; that the defendant's older brother was in a gang; that the defendant had no older male to look up to as a role model; that the defendant got involved with drugs and alcohol at the age of 11 years due in part to his older brother; and that the defendant has a learning disability."

Of all this evidence, counsel offered only the first two items in mitigation at defendant's sentencing hearing. Had counsel investigated defendant's background even minimally, he could have easily presented the remainder. This failure raises a serious doubt as to the reliability of defendant's sentencing. See *Perez*, 148 Ill. 2d at 194-95.

This court has acknowledged the critical importance to the sentencing decision of evidence of a capital defendant's background and any mental or emotional problems that afflict him. *Coleman*, 168 Ill. 2d at 537. At the same time, not every "disorder" will necessarily be mitigating, and we must assess prejudice in a realistic manner based on the totality of the evidence. *Coleman*, 168 Ill. 2d at 537, 538. Here, the State argues that much of the mitigating evidence counsel might have introduced could just as well be considered aggravating. However, the circuit court clearly stated that it "d[id] not consider everything that was offered as mitigating evidence to be mitigating evidence," and nonetheless found that "[h]aving considered *all* of the evidence, \*\*\* the petitioner has shown there is a reasonable probability that but for trial counsel's errors the sentencing Court would have found the balance of aggravation and mitigation evidence would not have warranted death." (Emphasis added.) We cannot say that this is an erroneous assessment of *Strickland*'s second prong. See *Perez*, 148 Ill. 2d at 195.

We conclude that the circuit court's determination that defendant was denied the effective assistance of

counsel at his capital sentencing hearing was not manifestly erroneous. We therefore affirm the judgment of the circuit court of Cook County vacating defendant's death sentence and ordering a new sentencing hearing.

*Affirmed.*