NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180067-U

NO. 4-18-0067

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| THOMAS L. MOWEN, | ) | No. 10CF17 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Mark A. Drummond, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not err in denying defendant's postconviction petition at the
conclusion of third-stage proceedings as defendant failed to make a substantial
showing he was denied due process as a result of alleged perjury by the State's
witness.

¶ 2          In February 2017, defendant, Thomas L. Mowen, filed an amended petition under

the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 to 122-8 (West 2016)),

asserting, in part, the State knowingly used perjured testimony of a witness, Richard Whitaker,

who testified "he did not receive anything in return for his cooperation." After an evidentiary

hearing, the trial court denied the petition. Defendant appeals, arguing the use of perjured

testimony denied him due process. The State counters, alleging defendant failed to prove perjury

occurred and harmless error. We agree with the State and affirm.

¶ 3                                    I. BACKGROUND

¶ 4          In January 2010, defendant was charged with home invasion (720 ILCS 5/12-

11(a)(2) (West 2008)) and residential burglary (720 ILCS 5/19-3(a) (West 2008)). A jury trial

was held in February 2011.

¶ 5          Summer Tallent testified she was the victim of a home invasion on November 2,

2009. On that night, she and her five-year-old son were home when, around 10:30 or 10:45 p.m.,

Tallent heard a knock on her door. When she saw no one at the door, Tallent exited onto the

steps to look around. Two masked individuals ran up from the left side of her house and threw

Tallent into the house. It was dark in the room. Tallent fought the intruders, kicking both out the

door. A "third guy" approached from the right side of the house and ran up the stairs. Knowing

her son was asleep upstairs, Tallent screamed. She was struck on her head. Tallent then ran to her

son's room. The third person was in her room, holding her purse. That person ran downstairs and

out the door.

¶ 6          Tallent could not identify the intruders. She described the purse as having a "cow

print." She identified the State's exhibit as her purse. At the time it was taken, the purse

contained cash, a Link card, and a child-support check made payable to her.

¶ 7          On cross-examination, Tallent stated she could not identify any specific items the

assailants were wearing. She did not recall telling police the assailants wore dark coats. The

individuals "were all skinny to medium build." Tallent did not know if the individuals were all

approximately 5 feet 9 inches in height. It was not like the assailants "were towering over [her]

or shorter than [her]." Tallent was 5 feet 9 inches tall. Tallent was not certain all three of the

assailants were male, and she had been threatened by a woman. Tallent agreed she told the

officers the assailants "fought like girls." Tallent explained she had never been in a fight like that. She thought she "wouldn't have been able to kick guys out of [her] house."

¶ 8    Richard Whitaker, age 39, testified, on November 2, 2009, he, James Clarke, and defendant decided to take drugs from Tallent's house. He admitted he pled guilty to residential burglary for the events of that night. He testified, in part, regarding his negotiated plea:

"[THE STATE]: What was your sentence in that case?

A. 10 years at 50 percent.

Q. 10 years?

A. Yes.

Q. Was anything promised to you in exchange for your testimony here today?

A. No, sir.

Q. Were there any agreements between yourself and the People as far as your testimony here today?

A. No, sir.

Q. Are you getting anything out of your testimony here today?

A. No, sir."

Whitaker also admitted he had an aggravated burglary conviction in Tennessee.

¶ 9    According to Whitaker, while he, Clarke, and defendant were drinking and walking, Whitaker had the idea of stealing drugs from Tallent, whom he had previously dated. They planned to take the drugs and money by "strong arm." Whitaker, who knew where Tallent

"kept the stuff," would run upstairs. Clarke was to hold Tallent in the living room; defendant was to insure no one entered the home.

¶ 10        Whitaker testified, at approximately 11 p.m. on November 2, the three went to Tallent's house. Whitaker wore a black T-shirt over his face. Clarke, who wore an orange mask, carried a crowbar in his back pocket. Defendant "had just a hoodie pulled over." At Tallent's house, Whitaker opened the screen door and kicked the door "pretty hard twice." The door would not open. Whitaker heard Tallent say, "Hold on, wait a minute." The three ran to the other side of the house and waited. When Tallent opened the door, Whitaker "strong[-]armed opened it" and forced his way into the house. Whitaker pinned Tallent against the door. Clarke entered right behind Whitaker. Defendant remained on the steps to the house. Whitaker ran upstairs to Tallent's closet, which he ransacked. Whitaker found some coins and knives. He then looked in Tallent's dresser drawers and under the mattress. Whitaker grabbed Tallent's purse. He identified the State's exhibit as the purse he took. Whitaker then ran downstairs and fled the house. Clarke and defendant were already running down the alley.

¶ 11        Whitaker ran directly to defendant's house. Defendant's wife, Dianne Mowen, met him at the door. Clarke and defendant arrived one to two minutes later. The four emptied the purse's contents onto the kitchen table. The four split the money. A short time later, Whitaker and Dianne went to a bar on Fifth and Elm Streets to cash the child-support check. They split the proceeds four ways. Willie McGlaughlin, a friend of Clarke's, then drove Whitaker, Clark, and defendant to Walmart around 12:30 a.m. on November 3. McGlaughlin stayed in the truck while the other three entered the store. Using Tallent's Link card, the three bought groceries. After leaving Walmart, the men went to State Street Bank to try to get money with the credit card. To

- 4 -

conceal his identity at the automated teller machine (ATM), Whitaker covered his face with "[t]he orange one." Defendant and Clarke remained in the truck.

¶ 12 According to Whitaker, several days later, the police arrived to ask him questions. Whitaker initially denied having any knowledge of the incident. However, he then told the officers about his, Clarke's, and defendant's involvement. Whitaker voluntarily gave up defendant's name, thinking he was "doing the right thing" and "would get less time."

¶ 13 In addition to testifying, Whitaker identified photographs showing the three men as they entered Walmart, shopped, and exited the store. Whitaker also identified the three men on a video of Whitaker swiping Tallent's Link card.

¶ 14 On cross-examination, Whitaker testified, when he and Clarke entered Tallent's house, defendant stayed outside the house. The last time Whitaker saw defendant before he entered the house, defendant was standing on the two steps leading to the entrance to the house. Whitaker grabbed Tallent and held her for approximately 30 seconds. Clarke then grabbed Tallent and took her into the living room. Whitaker did not strike Tallent. Defendant stayed outside. Defendant's hoodie was black.

¶ 15 Before going to Walmart, Whitaker and Clarke did not change clothes. Defendant may have. Whitaker did not remember. Whitaker agreed it was possible he told the police defendant wore a red shirt during the robbery but that he changed before going to Walmart.

¶ 16 James Clarke testified he had known defendant for approximately two-and-a-half years. Clarke admitted he pled guilty to residential burglary for the events of November 2, 2009, for which he was sentenced to 10 years' imprisonment. In exchange for his testimony at defendant's trial, Clarke was not given or promised anything. No agreements were reached

between himself and the State. Clarke agreed he had been to prison three other times for felonies, including burglaries, attempt (burglary), and possession of burglary tools.

¶ 17        According to Clarke, on November 2, 2009, he, Whitaker, and defendant broke into Tallent's house and robbed her. Whitaker initially had the idea while with Clarke and defendant. They planned Whitaker would be the first to enter; Clarke would follow and secure Tallent while Whitaker would run upstairs to search the apartment. Defendant was to stand at the door to insure Tallent would not leave. Clarke wore an orange ski mask and gloves. Clarke also carried a crowbar. Whitaker put tape on his shoes, wrapped a T-shirt around his head, and pulled up his hoodie. Defendant "had a hoodie that he put on and tied *** over his face." Defendant's nose and eyes remained visible.

¶ 18        Clarke testified Whitaker attempted to kick in the door but failed. Clarke heard Tallent say she would be down in a minute. When Tallent opened the door, Whitaker rushed in and "took her to the ground." After Whitaker rolled off Tallent, Clarke used the crowbar to hold Tallent on the ground. Defendant stood in the doorway while Whitaker ran upstairs. Tallent was screaming and yelling. When Tallent began to stand, Clarke struck her with the crowbar. Tallent was bleeding. She ran toward the door at defendant, who pushed her back into the house. Right after that, defendant and Clarke fled. Whitaker was still upstairs. Clarke threw the crowbar into a bush.

¶ 19        After leaving Tallent's house, Clarke and defendant ran to defendant's house. Whitaker was already there. Dianna was there as well. Whitaker was carrying Tallent's purse. The four divided the cash from Tallent's purse. There were some credit cards, a Link card, and a child-support check. Dianna forged Tallent's name on the check, and they went to a bar to cash

the check. Whitaker and Dianne went inside. The four split the money from the cashed check. They returned to defendant's house. Clarke contacted his friend McGlaughlin for a ride to Walmart.

¶ 20         Clarke identified photographs of him, defendant, and Whitaker, who were entering and shopping in Walmart. Defendant wore a white T-shirt. He had removed his hoodie. At Walmart, the men used Tallent's Link card to purchase approximately $200 worth of groceries. Whitaker and Clarke kept most of the groceries. After Walmart, they attempted to get cash from an ATM. Whitaker borrowed Clarke's mask to conceal his identity. They attempted to do the same at another ATM. From there, defendant was dropped off at his house. Then, Clarke and Whitaker went home. They resided together. Clarke put his ski mask and glove under his sink.

¶ 21         According to Clarke, the police arrived a few days later to talk to him. Clarke did not confess at that time. He later pled guilty and went to prison. After he had been sentenced and spent a couple of months in jail, the police approached Clarke again. At that point, Clarke told the police what he told the jury.

¶ 22         On cross-examination, Clarke testified the idea to rob Tallent was first mentioned by Whitaker at defendant's house. When Officer Martin visited Clarke in prison, he did not recall telling the officer defendant struck Tallent with the crowbar. Clarke stated defendant pushed Tallent. At the end of his conversation with Officer Martin, Clarke asked her if someone could fix his "time sheet on [his] sentence." He denied asking if some time could be taken from his sentence. He stated it could not, as 30 days had passed since he pled guilty. He denied telling Officer Martin he had 30 days to appeal his sentence and he was on the 28th day.

¶ 23        Dena Coffey, in November 2009, was employed at the Hard Rock Saloon, at the corner of Fifth and College Streets in Quincy, Illinois. She remembered cashing a child-support check written to "Summer." She remembered the check because it was a child-support check, the name was unusual, and the man gave her a $10 tip for cashing it. A man and a woman brought the check in.

¶ 24        Matthew Miller testified he had known defendant for approximately 10 years. In early November 2009, around 1 a.m., defendant called Miller and asked for a ride to Walmart. Because his son was sleeping, Miller refused. Several weeks later, defendant called Miller again. During this call, defendant told Miller not to talk to Detective Cathy Martin. Defendant also told Miller to say Miller was watching a football game with him on the night of November 2, 2009. Miller testified he was with defendant that night only until 9:30 p.m.

¶ 25        Miller further testified defendant wanted to backdate some photos of the two of them together to give to Detective Martin. On March 1, 2010, Miller went to defendant's house to take those photographs. At the time, Miller brought his then-wife and his son to defendant's house. Defendant was there with his wife and daughter. The two families took some photographs and backdated those photographs to November 2, 2009, at 10:15 p.m. Dianna backdated the digital cameras to that date. Around 2 a.m. on March 2, 2010, the group went to Walgreens to print the photographs. The plan was for Miller to give Detective Martin the photographs to prove Miller was with defendant late on November 2, 2009.

¶ 26        On cross-examination, Miller testified he had been with Whitaker, Clarke, and defendant at 9 p.m. Miller gave them a ride to Hard Rock to cash a check.

¶ 27        Cathy Martin worked in investigations with the Quincy Police Department.

Detective Martin met with Tallent at Blessing Hospital near midnight on November 3, 2009. She had numerous abrasions and bruises on her arms and a laceration above her forehead.

¶ 28 According to Detective Martin, the investigation led to Whitaker and Clarke. After Detective Martin spoke to Whitaker, a search warrant for Clarke's address was obtained. Defendant consented to the search of his address. During that search, Detective Martin found a cow-print purse next to defendant's bed as well as a black T-shirt that was worn by Whitaker.

¶ 29 Detective Martin testified, when she first spoke to Clarke, he did not tell her anything. After Clarke was sentenced, however, Detective Martin met with Clarke at Graham Correctional Facility. Detective Martin made no promises or agreements with Clarke. Clarke told her if she went back to his residence and looked behind the kick plate under the bathroom sink, she would find an orange ski mask, gloves, and other items. She did and found the ski mask and gloves.

¶ 30 Detective Martin also spoke to defendant, who denied being involved. Defendant said he was home all night, and his wife and daughter could verify that fact.

¶ 31 On cross-examination, Detective Martin testified regarding statements Tallent made immediately after the offense. Tallent described the assailants as having a "thin to medium build" and said they "fought like girls." Detective Martin believed the manner in which one of the assailants grabbed Tallent, who was 5 feet 9 inches tall, indicated that assailant was taller than 5 feet 9 inches. Tallent reported the assailants "were not very strong or very big."

¶ 32 Detective Martin talked to Whitaker the first time on November 4, 2009. At that time, Whitaker told Detective Martin he rushed into the home while defendant stayed outside and Clarke grabbed Tallent. On November 5, 2009, when they talked again, Whitaker stated he

did not think defendant changed clothes before going to Walmart. He also reported defendant, at the time of the offense, wore a red T-shirt.

¶ 33    During the first conversation with Clarke, Clarke reported he hit Tallent with the crowbar and dropped it. Clarke further reported defendant picked up the crowbar and also struck Tallent. At the end of the conversation in prison, Clarke asked for consideration for his conversation. He was interested in getting time off his sentence. Clarke reported he had 30 days to appeal and he was on day 28.

¶ 34    On redirect examination, Detective Martin testified when Clarke asked for consideration, Detective Martin responded it was not up to her. She called the state's attorney's office and was informed "absolutely not." Before talking to Detective Martin, Clarke asked for a cigarette and said he would tell the truth.

¶ 35    On behalf of defendant, Chad Downs, a jail administrator for the Adams County Sheriff's Department, was called to testify. Downs testified Whitaker and Clarke were lodged in the same section the night before their testimony. They were free to move about and talk with others in the section.

¶ 36    Dawn Ann Lehner, formerly known as Dawn Abernathy, testified she was previously Whitaker's girlfriend. Lehner and Whitaker exchanged text messages up until he was arrested. Around November 4, 2009, Lehnar and Whitaker exchanged multiple texts. Whitaker texted something like, "I heard you beat Summer's ass." Lehner responded, "I never touched her." The two argued over texts. Lehner at one point stated, "Well, she probably deserved it." Lehner testified she had not met Tallent until four months before her testimony at defendant's trial. When asked if she in fact texted, "No comment, or something to that effect," Lehner said,

"I believe so."

¶ 37 Lehner agreed after she texted, "no comment," she may have said, "[s]he disrespected me in the biggest way, sweetie." Lehner reported she probably wanted Whitaker to believe she had "beat" Tallent. Lehner did not recall Whitaker telling her Tallent was selling crystal methamphetamine. Lehner admitted texting: "That's what I heard. I don't even know them. She doing all that shit and still can't lose weight." Lehner said when she met Tallent, she learned Tallent was "not even a big girl." Lehner believed Whitaker was trying to get her to admit she beat up someone. Lehner recalled Whitaker had Tallent and Lehner fighting over the phone, as "he was with her and me at the same time."

¶ 38 David Distin, an officer with the Quincy Police Department, testified he interviewed Tallent on November 2, 2009. Tallent informed him the assailants were 5 feet 9 inches with a medium to skinny build. All assailants were white. Tallent was not certain all three were male. Tallent said the assailants wore pants and dark coats and ski masks. Tallent reported after she was dragged outside by the two attackers, a third individual ran past her and up the steps.

¶ 39 On cross-examination, Officer Distin testified when he was talking to Tallent there was blood on her face and elbow. Officer Distin said the blood was pooling in the entryway. Tallent was crying. Her child was in the house. It was 10:52 p.m. when Officer Distin received the call. It was dark outside.

¶ 40 E.M., defendant's 12-year-old daughter, testified on November 2, 2009, she was at defendant's house. E.M. had gone to school earlier that day. When she returned home, she remained home the rest of the evening. E.M. went to bed a little after midnight. Her

- 11 -

grandmother, Kay Huddleston, arrived at the house around 11 p.m. Dianna and a few others, including Miller and "Ringo," stopped by. Defendant was home all evening. Everyone, including E.M., was watching the Falcons and the Saints. When the game ended, defendant started a fire and drank a few beers with E.M.'s grandmother.

¶ 41 On cross-examination, E.M. testified she remembered going to a police station in February 2010 and talking to a police officer. She recalled possibly saying she watched a game between "the Phillies and the Rams." E.M. agreed she told the officer her father, Miller, and Miller's stepson were at the house that evening and they played darts. She agreed she said her father began to argue about what would be on television. She denied telling the officer she went to bed around 9 p.m. that night. She remembered the officer saying if E.M. had gone to bed at 9 p.m., how could she know defendant did not leave that night. E.M. recalled telling the officer she had good ears and did not hear anyone leave or arrive at the house. E.M. was asked about the photographs taken in March 2010. She looked at the photographs of defendant, Miller, and Miller's stepson. They were holding darts.

¶ 42 Kay Huddleston, defendant's mother-in-law, testified she was at Dianna's and defendant's house on November 2, 2009. She arrived around 10 p.m. and saw defendant and Bill Nichols, the landlord, outside drinking. Huddleston joined them. Huddleston's boyfriend arrived. Huddleston did not know how long she was there.

¶ 43 On cross-examination, Huddleston admitted telling the prosecutor before taking the stand that she left around midnight. When asked who told her she left around midnight, Huddleston said defendant did as he left shortly after she did.

¶ 44 Defendant testified on his own behalf. Defendant worked security and in

construction. On November 2, 2009, he got off work at 5 p.m., which he did every day. He went back to his house and watched Monday Night Football. That night, the Saints and the Falcons played. When the pregame started, defendant was home with just his wife and daughter. E.M. did not want to watch the game, and they argued for a while. The game "started to be a blow-out" and his mother-in-law arrived, so they decided to go outside. Defendant started a fire. Nichols was out back. Huddleston and her boyfriend were there as well. Huddleston left right around midnight, just before defendant left to go to Walmart.

¶ 45       Defendant testified Whitaker called him around 12:10 a.m., asking him for a ride to Walmart. Defendant tried to get Miller to give him a ride, but Miller was unable to do so. Whitaker called back, saying he had another ride lined up. Whitaker wanted to know if defendant needed a ride. Defendant said he did. He met Whitaker at the Save-a-Lot parking lot. Clarke was driving McGlaughlin's truck. Whitaker was in the backseat. McGlaughlin stayed in the truck while the others shopped. They left Walmart shortly after 1 a.m. After leaving Walmart, they stopped at an ATM. When Whitaker re-entered the truck, he, McGlaughlin, and Clarke were whispering. Defendant could not hear what they were saying. They dropped defendant off at his home. Dianna was there when he arrived.

¶ 46       According to defendant, he was home when Detective Martin asked for consent to search his residence, which he gave. The purse was found on his wife's side of the bed, tucked in between the nightstand. Defendant was surprised the purse was there. As for the pictures in Miller's camera, defendant testified the pictures were from Miller's camera. Defendant's camera imprinted the time and date in a different color.

¶ 47       On cross-examination, defendant testified E.M. was allowed to stay up late

because "for some reason" there was no school on November 3. Shortly after he arrived home from work on November 2 at 5 p.m., defendant played darts with Miller and his son. Around 9 p.m., defendant and Miller went to Walgreens. They returned around 9:45 p.m. Between 9:45 p.m. and midnight, defendant did not leave home. Defendant recalled talking to Detective Martin about where he was on November 2. Defendant believed he told her he was home all day, except for the time he was at work. He did not, at that time, tell her about the trip to Walgreens. When she asked if someone could verify he was home, defendant told her Dianna and his daughter could. Defendant did not tell Detective Martin his mother-in-law could verify he was home. He also did not name Miller or anyone else who was drinking with him at the fire. Defendant said it did not seem relevant at that point.

¶ 48　　　　The State called a rebuttal witness, Erica Scott, who worked for the Quincy Police Department. Scott testified she spoke to E.M. around 12:40 p.m. on February 27, 2010, and E.M. told her E.M. went to bed at 9 p.m.

¶ 49　　　　The jury found defendant guilty of both offenses. He was sentenced to concurrent prison terms of 10 years for residential burglary and 15 years for home invasion. Defendant pursued a direct appeal of his conviction, arguing his conviction for residential burglary must be vacated as it was based on the same act as the conviction for home invasion. We disagreed and affirmed. *People v. Mowen*, 2012 IL App (4th) 110432-U, ¶ 4.

¶ 50　　　　Defendant filed his initial postconviction petition in July 2013. Counsel was appointed. In February 2017, appointed counsel referenced a *pro se* amended petition prepared by defendant. Counsel informed the trial court she would stand on the *pro se* amended petition if the petition were allowed. It was. Defendant's February 2017 *pro se* amended petition for

postconviction asserts fifteen enumerated claims. One claim is relevant to this appeal: the State knowingly used perjured testimony of Richard Whitaker, who testified he did not receive anything in return for his testimony when he received the State's agreement on a plea due to his cooperation and special smoking privileges. Defendant attached to his petition transcripts from Whitaker's January 2010 sentencing hearing, at which the following statements were made:

> "[WHITAKER'S COUNSEL]: Your Honor, we obviously would ask that you concur in this negotiation. My client would like the Court to know that he fully cooperated in the investigation and not only had given a statement to the investigators, but he also assisted with giving more information to the Task Force officials. This home invasion was the result of the gentlemen looking for meth that they knew Summer Tallent normally kept in her purse.
>
> MR. FARHA: Your Honor, we would concur with that. And that is partially the reason for just the ten years."

¶ 51    Defendant further attached to his petition an article by Rodney Hart appearing in the *Herald-Whig*. The article, entitled "Quincy man gets 10-year sentence for burglary," states as follows, in part:

> "A Quincy man was sentenced Friday to 10 years in prison for a November residential burglary. Richard Whitaker, 38, was arrested with James Clarke, 39, after authorities said the two men entered a Quincy woman's apartment Nov. 2 without permission.
>
> Whitaker told Judge Scott Walden during Friday's hearing

- 15 -

that he was high on crystal methamphetamine and drunk when the home invasion took place.

'I was out of my mind,' Whitaker said.

Whitaker had a charge of home invasion dropped in exchange for pleading guilty to the residential burglary.

\* \* \*

As part of his plea negotiation, Whitaker must testify truthfully at Clarke's trial."

¶ 52 After the trial court denied the State's motion to dismiss defendant's petition, the petition advanced to a third-stage evidentiary hearing. The hearing was held in September 2017. No further evidence was presented on defendant's perjury claim. After the hearing, the court issued a detailed written order addressing defendant's postconviction claims. As to defendant's claim regarding the State's knowing use of perjury, the trial court held "[n]owhere in the sentencing transcript is any reference to testifying against either Clarke or the Defendant in exchange for a light sentence." The court observed as of the date of Whitaker's sentencing, defendant had not been charged with an offense. The court denied defendant's postconviction petition.

¶ 53 This appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55 Defendant argues he made a substantial showing he was denied due process when the State allowed Whitaker to commit perjury and used the perjured testimony to secure his conviction. Defendant emphasizes the transcripts from Whitaker's sentencing hearing showing

- 16 -

Whitaker's 10-year sentence was recommended due, in part, to Whitaker's cooperation with the investigation as well as to the newspaper article showing Whitaker received consideration for testifying at Clarke's trial. Defendant further contends the perjured testimony was not harmless error. In support, defendant points to the fact the prosecutor emphasized the perjured statements in closing argument, the testimony of the witnesses regarding the circumstances of the offense was inconsistent, and Tallent's testimony showed a woman could have committed the offense.

¶ 56    The State disagrees perjury occurred. The State maintains defendant failed to make a substantial showing his right to due process was denied as the challenged testimony was not false. According to the State, defendant's evidence does not show Whitaker received any consideration for his testimony at defendant's trial. In addition, the State concludes the testimony, even if perjured, was harmless error given Whitaker's and Clarke's testimony, video showing defendant at Walmart with Whitaker and Clarke when the stolen Link card was used, and testimony showing Tallent's purse was found in defendant's home.

¶ 57    This appeal follows a denial of defendant's petition filed under the Postconviction Act. This act provides a three-stage process by which a petitioner may obtain review of a claim he or she suffered a substantial denial of a constitutional right upon his or her conviction. *People v. Dopson*, 2011 IL App. (4th) 100014, ¶ 17, 958 N.E.2d 367 (2011). At the third stage of proceedings, an evidentiary hearing may be held and the defendant may present evidence. *People v. Andrews*, 403 Ill. App. 3d 654, 659, 936 N.E.2d 648, 653 (2015). To prevail, the defendant must make "a substantial showing of a constitutional violation." *People v. Pendleton*, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 1008 (2006). Following an evidentiary hearing, we will not overturn a trial court's decision unless the decision is manifestly erroneous. *People v. Coleman*, 206 Ill. 2d

261, 277, 794 N.E.2d 275, 286 (2002). Manifest error is "error that is 'clearly evident, plain, and indisputable.' " *Id.* at 277 (quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85, 686 N.E.2d 574, 582 (1997)).

¶ 58          Defendant's postconviction claim on appeal involves an allegation of perjury. A State's knowing use of perjured testimony to obtain a conviction is a violation of due process. *People v. Moore*, 2012 IL App (4th) 100939, ¶ 28, 975 N.E.2d 1083; see also *People v. Cihlar*, 111 Ill. 2d 212, 216-17, 489 N.E.2d 859, 861 (1986) ("[T]he deprivation of an individual's liberty based upon false testimony is contrary to fundamental principles of fairness in a civilized society."). To obtain a reversal of a conviction due to the use of perjured testimony, the defendant must present " 'clear, factual allegations of perjury and not mere conclusions or opinions.' " *Id.* (quoting *People v. Thomas*, 364 Ill. App. 3d 91, 104, 845 N.E.2d 842, 855 (2006)). Perjury is not committed when no false statement is made. See generally 720 ILCS 5/32-2(a) (West 2016) (defining criminal perjury).

¶ 59          In this case, the trial court did not err in finding defendant failed to make a substantial showing his rights to due process were violated through the State's use of perjured testimony because defendant failed to identify any false testimony. The "false testimony" defendant identifies is Whitaker's testimony he was not "getting anything out of [his] testimony." To prove the contention this testimony is false, defendant relies on two pieces of evidence to establish the falsity of Whitaker's testimony: (1) the transcript of Whitaker's sentencing hearing and (2) a newspaper article regarding Whitaker's sentencing. Neither piece of evidence, considered alone or together, makes a substantial showing the testimony was perjured. The transcript from Whitaker's sentencing hearing shows Whitaker's counsel informed the court

- 18 -

defendant "had fully cooperated in the investigation" and provided "information to the Task Force officials." The State concurred, stating, "[T]hat is partially the reason for just the ten years." These statements refer to past conduct by Whitaker, conduct that occurred before defendant was charged in this case—Whitaker's cooperation with the investigation. No reference is made to future testimony. No reference is made to any future action by the State.

¶ 60          Similarly, the newspaper article does not prove Whitaker's testimony is false. Newspaper articles are heresay and inadmissible. "[F]actual matters should not be proven by newspaper reports of occurrences" as they "are often, if not notoriously, apt to be inaccurate." *McCall v. Devine*, 334 Ill. App. 3d 192, 203, 777 N.E.2d 405, 415 (2002) (quoting R. Steigmann, Illinois Evidence Manual § 14:28, at 365 (2d ed. 1995)). We further note the article references only Whitaker's testimony at *Clarke*'s trial.

¶ 61          Nevertheless, defendant argues Whitaker received a benefit from testifying. Defendant argues "the record fails to show that Whitaker's agreement and cooperation were limited to actions that did not include testifying against Mowen." Defendant has the burden of proving a substantial deprivation of a constitutional right. It was, therefore, his burden to show Whitaker's cooperation with the investigation somehow expanded to testifying at defendant's trial, which occurred well after Whitaker's sentencing. He did not meet this burden. Defendant further emphasizes Whitaker's cooperation, which led to his 10-year sentence, necessarily included Whitaker's testifying at his trial as the right against self-incrimination would no longer protect Whitaker from testifying. Defendant has cited no authority for this argument. It is not convincing. Defendant asserted he was not receiving any benefit for testifying against Whitaker. His own testimony demonstrated he cooperated with the investigation with hopes of receiving a

lighter sentence.

¶ 62 The cases cited by defendant are distinguishable, as evidence in those cases clearly established the key witnesses falsely testified at trial. For example, in *People v. McKinney*, 31 Ill. 2d 246, 248, 201 N.E.2d 431, 432 (1964), the witness testified no one offered him leniency if he would testify against the defendant, he "had no conversation at all" with anyone from the state's attorney's office, and he expected no leniency in return for his testimony. However, the evidence established just twelve days after the defendant was convicted, the state's attorney filed a motion to reduce the witness's sentence. *Id.* In the motion, the State reported it would recommend a reduction if the witness cooperated with the State in the case against the defendant, the witness testified against the defendant, and the trial resulted in a guilty verdict. *Id.* In *People v. Lueck*, 24 Ill. 2d 554, 555-56, 182 N.E.2d 733, 733 (1962), the codefendant testified he was not offered any inducement for testifying as a witness, but the record demonstrated when the codefendant pleaded guilty, the State asked to delay his sentencing until the codefendant could testify at the defendant's trial. *Id.* At the codefendant's plea hearing, the State informed the trial court it would recommend the codefendant receive a sentence of probation if the codefendant testified at the defendant's trial. *Id.* at 556.

¶ 63 III. CONCLUSION

¶ 64 We affirm the trial court's judgment.

¶ 65 Affirmed.